IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**STATE OF ARIZONA,**
*Appellee,*

*v.*

**JASON EUGENE BUSH,**
*Appellant.*

---

No. CR-11-0107-AP
Filed August 16, 2018

---

Appeal from the Superior Court in Pima County
The Honorable John S. Leonardo, Judge
No. CR-2009-2300-003
**AFFIRMED**

---

COUNSEL:

Mark Brnovich, Arizona Attorney General, Dominic E. Draye, Solicitor General, Lacey Stover Gard (argued), Chief Counsel, Capital Litigation Section, Tucson, Attorneys for State of Arizona

John L. Saccoman (argued), Law Office of John L. Saccoman, Phoenix; and Brent E. Graham, Law Office of Brent E. Graham, PLLC, Glendale, Attorneys for Jason Eugene Bush

---

JUSTICE PELANDER authored the opinion of the Court, in which VICE CHIEF JUSTICE BRUTINEL, and JUSTICES TIMMER, BOLICK, and GOULD joined. CHIEF JUSTICE BALES authored a separate opinion

concurring in part. JUDGE WINTHROP authored a separate opinion concurring in part and dissenting in part.[*]

———————————

JUSTICE PELANDER, opinion of the Court:

**¶1**　　　　This automatic appeal arises from Jason Eugene Bush's convictions and death sentences for murdering nine-year-old Brisenia Flores and her father, Raul "Junior" Flores, in their Arivaca home. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031 and 13-4033(A)(1).

## BACKGROUND

**¶2**　　　　The facts largely mirror those in *State v. Forde*, in which this Court affirmed the first degree murder convictions and death sentences of Shawna Forde, Bush's accomplice and the "self-proclaimed leader of a private 'minuteman' border monitoring group" in which Bush participated. 233 Ariz. 543, 552 ¶ 2 (2014). On the evening of May 29, 2009, Junior Flores, his wife, Gina Gonzales, and their daughter, Brisenia, were at their home while the couple's other daughter spent the night with a relative. After Junior and Gina went to bed, and as Brisenia slept on the living room couch, Junior woke Gina to tell her law enforcement officers were at their door. Gina rose from bed and joined Brisenia, who was still asleep on the couch, while Junior went to the door.

**¶3**　　　　Gina heard two voices, a male and female, order Junior to open the door so they could enter to "take a look." Junior complied, and a man and woman entered the Flores's home. The man was tall, wore camouflage and black face paint, and carried a handgun and a longer gun covered with duct tape. Junior pressed the intruders for identification and asked the man why one gun was covered in duct tape. The man responded, "Don't take this personally but this bullet has your name on it," and shot Junior in the chest. The man then turned the handgun on Gina and shot her in the shoulder and thigh. After Gina fell to the floor, the man focused again

———————————

[*] Justice John R. Lopez IV has recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable Lawrence F. Winthrop, Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.

on Junior, who was yelling, "Stop shooting my wife," and killed him with additional shots.

¶4        Lying on the floor feigning death, Gina heard two more men, both Spanish-speaking, enter the home. Brisenia awoke, began crying, and asked the armed man why he shot her father. He told Brisenia everything would be okay, that nobody would hurt her, and asked about her sister's whereabouts. Brisenia said her sister was spending the night with a relative. Gina then heard the man load his gun while Brisenia repeatedly begged, "Please don't shoot me." Despite her pleas, the man fatally shot Brisenia twice in the face at point-blank range.

¶5        After hearing the female intruder tell the group to leave, Gina called 911 and attempted to aid Brisenia, who was shaking and struggling to breathe. The female intruder then returned, saw that Gina was still alive, and ordered someone to "go back and finish her off." Gina immediately rushed to the kitchen, grabbed a gun Junior kept there, and collapsed on the kitchen floor. Meanwhile, the tall man with black face paint reentered the home and began shooting at Gina, who returned fire. Gina heard the man cry out in pain before leaving the home. When another man entered, Gina yelled, "Get the hell out," and "That is enough," which prompted the man to leave. Gina returned to the phone, which was still connected to the 911 dispatcher, and waited for police.

¶6        Law enforcement officers identified Albert Gaxiola as a suspect in the murders and, after obtaining a search warrant, discovered Bush's DNA, fingerprints, and other incriminating items at Gaxiola's home. Officers located Bush ten days later at the residence he shared with his girlfriend. Bush, who had been wounded by Gina's gunfire, told his girlfriend that he had been shot in the leg while working for the military as an undercover immigration operative.

¶7        After arresting Bush on June 11, 2009, officers questioned him at the Mohave County Sheriff's Department for approximately four hours. Though initially denying any involvement in the murders, Bush eventually confessed to shooting and killing Junior and Brisenia, claiming that his accomplices threatened to kill him and his family if he did not do so. In addition to making numerous incriminating statements, Bush drew a diagram of the Flores's home and marked where each victim was when he shot them. The State charged Bush with two counts of first degree murder, A.R.S. § 13-1105, attempted first degree murder, A.R.S. § 13-1001, two

3

counts of aggravated assault, A.R.S. § 13-1204, first degree burglary, A.R.S. § 13-1508, armed robbery, A.R.S. § 13-1904, and aggravated robbery, A.R.S. § 13-1903.

¶8    A jury found Bush guilty on all counts. For the murder convictions, the jury found three aggravating circumstances: Bush was convicted of a serious offense, committed multiple homicides on the same occasion, and murdered a person under the age of fifteen. *See* A.R.S. § 13-751(F)(2), (8), (9). Considering those factors and the mitigation evidence, the jury sentenced Bush to death for each murder. For the non-capital convictions, the trial court sentenced Bush to prison terms totaling seventy-eight years.

## DISCUSSION

### A. Pretrial Motions for a Change of Venue and Continuance

¶9    Bush contends the trial court abused its discretion in denying his motion for a change of venue or, alternatively, a continuance, which he argues was necessary because of outrageous and extensive pretrial publicity about the case. We review for abuse of discretion a trial court's denial of a motion for a change of venue or continuance. *Forde*, 233 Ariz. at 553 ¶ 11; *State v. Dixon*, 226 Ariz. 545, 555 ¶ 53 (2011).

¶10    Bush's motion, filed a week before his trial, cited numerous internet articles allegedly containing "an overwhelming amount of prejudicial and inflammatory statements" about him. In denying the motion, the trial court reasoned that Bush had not shown he was entitled to a presumption of prejudice and could not show actual prejudice because the jury had not yet been selected. The court indicated it would explore Bush's concerns if the voir dire process failed to "yield an impartial jury." Bush unsuccessfully moved for a mistrial after jury selection but did not renew his motions for a change of venue or continuance.

¶11    Our review of pretrial publicity issues "entails a two-step inquiry to decide 'whether, under the totality of the circumstances, the publicity attendant to [the] defendant's trial was so pervasive that it caused the proceedings to be fundamentally unfair.'" *Forde*, 233 Ariz. at 553 ¶ 12 (quoting *State v. Cruz*, 218 Ariz. 149, 156 ¶ 13 (2008)). The first inquiry is whether "the publicity so pervaded the proceedings that the trial court erred by not presuming prejudice." *Id.* at 554 ¶ 12; *accord Cruz*, 218 Ariz.

at 156 ¶ 14. If the trial court properly declined to presume prejudice, the next inquiry is "whether the defendant showed actual prejudice." *Forde*, 233 Ariz. at 554 ¶ 12; *accord Cruz*, 218 Ariz. at 156 ¶ 14. We find no error under either inquiry.

**¶12** Courts "rarely presume prejudice due to outrageous pretrial publicity," *State v. Bible*, 175 Ariz. 549, 564 (1993), because of the defendant's extremely heavy burden to show "the publicity [is] 'so unfair, so prejudicial, and so pervasive that [the trial court] cannot give any credibility to the jurors' answers during voir dire,'" *Cruz*, 218 Ariz. at 157 ¶ 15 (quoting *State v. Bolton*, 182 Ariz. 290, 300 (1995)); *accord Bible*, 175 Ariz. at 564–65. "In other words, . . . the 'media coverage [must be] so extensive or outrageous that it permeate[s] the proceedings or create[s] a 'carnival-like' atmosphere,'" *Cruz*, 218 Ariz. at 157 ¶ 15 (quoting *State v. Atwood*, 171 Ariz. 576, 631 (1992)), devoid of the "fundamental and essential element[s] of . . . 'dignity, order, and decorum,'" *Bible*, 175 Ariz. at 567 (quoting *Illinois v. Allen*, 397 U.S. 337, 343 (1970)).

**¶13** Bush argues that pretrial publicity created the prohibited carnival-like atmosphere in his proceedings. But in *Forde*, which involved the same murders underlying this case, we noted that "[m]ost of the publicity occurred in the immediate aftermath of the crimes — approximately eighteen months before [Forde's] trial," and "most news accounts were essentially factual." 233 Ariz. at 554 ¶ 14; *see also State v. Kiles*, 222 Ariz. 25, 35–36 ¶¶ 46–50 (2009) (change of venue denied despite ten years of media coverage).

**¶14** Questionable or allegedly inaccurate publicity alone is not enough to presume prejudice, particularly when, as here, the "information in the great bulk of the news reports" was "largely factual." *Bible*, 175 Ariz. at 564. Nor does a presumption of prejudice arise merely because the media published an interview to which Bush agreed, or other articles stating that he confessed to the murders or discussing facts adduced during Forde's trial that implicated Bush in the murders. In short, Bush has not shown that "the media successfully influenc[ed] law enforcement officers[,] . . . court personnel[,] [or] the court itself." *Id.* at 565.

**¶15** "Absent presumed prejudice, the focus is whether the potential jurors 'could not judge impartially the guilt of the defendant.'" *Id.* at 566 (quoting *Patton v. Yount*, 467 U.S. 1025, 1035 (1984)). To prevail, the defendant must show that "the dissemination of the prejudicial material

will probably result in the party being deprived of a fair trial." Ariz. R. Crim. P. 10.3(b) (2011); *see also Bible*, 175 Ariz. at 566–67 (applying Rule 10.3(b)). Bush fails to make that required showing.

**¶16** Bush's actual prejudice argument primarily rests on the allegedly "inconsistent answers" Jurors 1, 5, 11, and 13 gave about their exposure to pretrial publicity. But all empaneled jurors disclosed their preliminary opinions regarding Bush's guilt and provided adequate assurances they would set their opinions aside and consider only the evidence presented at trial. These assurances plainly "undercut [his] prejudice claim." *Bible*, 175 Ariz. at 566. Additionally, nothing in the record supports departing from the well-established presumption that the jurors followed the trial court's instructions to consider only the evidence presented at trial. *Cruz*, 218 Ariz. at 158 ¶ 25. The court did not abuse its discretion in denying Bush's motion for a change of venue.

**¶17** Because Bush failed to show that the pretrial publicity prejudiced him, we likewise reject his claim of error relating to his motion for a continuance. *State v. Burns*, 237 Ariz. 1, 11 ¶ 10 (2015) ("We will not find that a trial court abused its discretion in denying a continuance unless the defendant shows prejudice.").

### B. Jury Selection and Voir Dire Issues

#### 1. Non-statutory Aggravators in Juror Questionnaire

**¶18** Jury selection in this case lasted five days and involved 225 potential jurors. Before trial, each juror received and completed an eighteen-page juror questionnaire containing many questions probing the juror's ability to deliver a fair and impartial verdict. In various ways, the questionnaire delved into the prospective jurors' views on capital punishment, and some questions sought to identify jurors who might harbor death-favorable views. The State and Bush's defense team received copies of the prospective jurors' completed questionnaires. In addition, the trial court conducted three voir dire sessions in which subgroups of prospective jurors were sworn in, instructed on the phases of a capital murder trial, and made available to the parties for questioning.

**¶19** Bush contends the trial court erred by allowing the State, through the juror questionnaire, to "improperly inject non-statutory

aggravating factors . . . for consideration by prospective jurors." Bush's argument is based on question 27, which stated:

> 27. If you agree the death penalty may be appropriate in some cases, please rank the following reasons from 1 to 4, 1 being most important, that would cause you to favor the death penalty.
>
> ____ To deter others from committing murder.
>
> ____ For economic reasons. It is expensive to house prisoners for the remainder of their lives.
>
> ____ Because an eye for an eye, is fair.
>
> ____ To protect the public against defendants who might get out of jail in the future.
>
> ____ Other (please specify): _____.

**¶20** "We review a trial court's decisions regarding the use and content of jury questionnaires for abuse of discretion," *State v. Naranjo*, 234 Ariz. 233, 241 ¶ 24 (2014), and "will not disturb the trial court's selection of the jury in the absence of a showing that a jury of fair and impartial jurors was not chosen," *State v. Moody*, 208 Ariz. 424, 451 ¶ 93 (2004) (internal quotation marks omitted) (quoting *State v. Walden*, 183 Ariz. 595, 607 (1995)).

**¶21** Despite having been furnished in advance with the trial court's proposed questionnaire, Bush did not object to question 27 or any other part. Instead, after the prospective jurors received, completed, and submitted their questionnaires, but before voir dire began, Bush moved for a mistrial on the ground that question 27 "engrained in [the jurors] that it is appropriate at some level for them to consider" the "improper and impermissible" non-statutory aggravating factors it lists. The trial court denied the motion but instructed the potential jurors that they were not to consider the factors listed in question 27. The court also asked the potential jurors whether they would disregard that instruction, but no juror indicated any such intent.

**¶22** The trial court's instruction and follow-up query notwithstanding, defense counsel still "ask[ed] each [potential juror]

individually" about whether they could "put those [reasons listed in question 27] aside" as non-factors and be fair and impartial. But in his further probing of the prospective jurors, counsel confusingly stated he was not "saying [they] can't think about these [factors]." The trial court later clarified that defense counsel's follow-up questioning was meant to determine whether the factors listed in question 27 are "still going to be something that you consider even if the Court instructs you [otherwise]."

¶23       In response to Bush's questioning, and contrary to their prior statements that they would follow the trial court's instructions on this point, petit Jurors 9, 11, and 13 indicated by raising their hands that they would consider a factor listed in question 27. Even so, and despite insisting he would move to strike any jurors who indicated they would consider question 27's factors, Bush did not move to strike any of these jurors.

¶24       Arizona law provides fourteen "aggravating circumstances" that, if alleged by the state, a capital case jury shall consider "in determining whether to impose a sentence of death." A.R.S. § 13-751(F). Bush contends that "question 27 called jurors' attention to non-statutory aggravating factors" and that he is entitled to a new trial because the final response of Jurors 9, 11, and 13 during voir dire indicates that "at least [their] verdicts were influenced by improper considerations."

¶25       We disagree. On its face, question 27 does not instruct jurors that the reasons it lists are aggravating factors, but rather expressly states that its purpose is to determine what reasons would lead a particular juror to "favor the death penalty" if given that sentencing option. Moreover, the trial court and the parties explained several times that each juror must follow the court's instructions generally and that jurors were not to consider the factors question 27 mentions. We presume the jurors heeded those instructions, *Cruz*, 218 Ariz. at 158 ¶ 25, and Bush's assertion that the reasons listed in question 27 influenced any juror's deliberation or decision is purely speculative.

¶26       Bush nevertheless contends that the post-instruction, show-of-hand responses made by Jurors 9, 11, and 13 indicate inadequate rehabilitation. But those conflicting responses at most suggest the jurors did not understand the purpose or substance of defense counsel's questioning. And to the extent there was confusion, it was at least partially attributable to counsel's misguided statement to the prospective jurors that "we're not saying you can't think about these [factors]."

¶27      In any case, later in the jury selection process the trial court asked if any prospective jurors "would be unable to follow the law" as given in the court's instructions, "disregarding [their] own notions of what the law is" or "ought to be." No juror responded or expressed any concern. In addition, during voir dire and later in the aggravation phase the prosecutor and the trial court clearly explained the separate phases of a capital case trial, the distinct issues the jurors would have to decide in each phase, and the three aggravators the State alleged. The court's aggravation-phase instructions expressly stated that "the State has the burden of proving beyond a reasonable doubt the aggravating circumstances it has alleged," all of which are listed in § 13-751(F). Bush fails to rebut the presumption that the jurors followed the court's instructions. *See State v. Prince*, 226 Ariz. 516, 537 ¶ 80 (2011).

¶28      In sum, the trial court did not abuse its discretion in allowing the prospective jurors to answer question 27 of the juror questionnaire. Nonetheless, we see little purpose for, and a potential risk of confusion and possible prejudice created by, a question such as question 27. We therefore disapprove of its future use in capital case pretrial juror questionnaires.

### 2. Denial of Individual Voir Dire

¶29      Bush contends the trial court violated his constitutional rights to a fair trial and due process by denying his request for individual voir dire. "We review a trial court's rulings on *voir dire* of prospective jurors for abuse of discretion," *State v. Glassel*, 211 Ariz. 33, 45 ¶ 36 (2005), and necessarily defer largely to a trial court's "sound discretion" in such matters, *Ristaino v. Ross*, 424 U.S. 589, 594 (1976) (internal quotation marks omitted) (quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)).

¶30      Bush moved before trial for individual, sequestered, and in-chambers voir dire, asserting it was necessary to "put the prospective juror at ease and encourage honest responses." The trial court denied the motion, noting that Bush's request was impracticable because of the large number of potential jurors. But the court said it would privately question a prospective juror "if that need became apparent" either from the juror's request or to avoid tainting the other prospective jurors. Based on the same reasoning, the trial court denied Bush's two subsequent filings seeking individual voir dire.

**¶31**      Notwithstanding the trial court's rulings, during the first day of voir dire defense counsel asked individualized questions to make sure the jurors were being "honest with [him]." The court took issue with the inefficient and ineffective manner of his questioning, but counsel insisted that he "ha[d] the right to ask [jurors] individually" because the juror questionnaire "implanted in their mind" that the factors listed in question 27 were appropriate. The trial court ultimately gave counsel considerable "leeway," such that his extensive and uninterrupted voir dire questions were a mixture of individual and group inquiries.

**¶32**      Relying in part on *Morgan v. Illinois*, 504 U.S. 719 (1992), Bush contends that individualized voir dire was constitutionally required in his "complex, highly publicized capital trial." But *Morgan* merely requires trial courts to allow "more detailed questioning of prospective jurors beyond . . . simple questions" to "evaluat[e] a prospective juror's ability to be impartial." *State v. Garza*, 216 Ariz. 56, 64 ¶ 25 (2007); *see also State v. Parker*, 231 Ariz. 391, 400 ¶ 21 (2013) ("We have repeatedly rejected invitations to expand *Morgan*'s holding."). And unlike in *Morgan*, the trial court here did not "refuse inquiry into whether a potential juror would automatically impose the death penalty upon conviction of the defendant." 504 U.S. at 721. Nor does Bush identify any occasion on which he unsuccessfully asked for voir dire of a specific juror individually. *Cf. State v. Moore*, 222 Ariz. 1, 10 ¶ 36 (2009) (finding no *Morgan* error when defendant "was allowed to question the jurors" and "[t]he trial court did not prevent defense counsel from asking life-qualifying questions"). Instead, the record shows that Bush had ample time and opportunity to probe the prospective jurors on their juror questionnaire responses, pretrial publicity, and other matters. *See Garza*, 216 Ariz. at 64 ¶ 25 (concluding that voir dire consisting of "extensive oral questioning and . . . a twenty-four page questionnaire completed by all prospective jurors" "complied with *Morgan*").

**¶33**      To the extent Bush suggests individual voir dire was necessary to prevent prospective jurors' answers from tainting the panel, we disagree. As in *Bible*, "the written questionnaire addressed many of the questions that might normally militate in favor of individualized . . . or in camera voir dire," and Bush "cites no 'contaminating' comment made during oral voir dire." 175 Ariz. at 570; *accord Forde*, 233 Ariz. at 560 ¶¶ 55–56. Accordingly, the trial court did not abuse its discretion in denying individualized voir dire. *See Bible*, 175 Ariz. at 570 ("Whatever the risk of the procedure used, the danger did not materialize.").

### 3. Exclusion of Evidence from Voir Dire

¶34      During the second day of voir dire, Bush moved to present to prospective jurors some graphic photographs of the murder victims and a tape recording of Gina's 911 call that the State intended to introduce as evidence at trial. Though acknowledging that this was a "novel idea that's generally not permitted during voir dire," Bush contended it was necessary to identify jurors who, after seeing the photographs and hearing the recording, would be "substantially impaired" from being fair and impartial during the mitigation phase. Bush argues that the trial court abused its discretion and violated his constitutional rights to a fair trial and due process by denying his request.

¶35      Although we generally review a trial court's voir dire rulings for abuse of discretion, *State v. Patterson*, 230 Ariz. 270, 273 ¶ 5 (2012), fundamental error review applies to Bush's constitutional claims because he did not raise them at trial, *State v. Henderson*, 210 Ariz. 561, 567 ¶ 19 (2005) (noting that "[a] defendant who fails to object at trial forfeits the right to obtain appellate relief except in those rare cases" involving fundamental error). Bush must therefore show error that is both fundamental and prejudicial. *Id.* ¶ 20.

¶36      Voir dire is "not meant to allow a defendant to 'ask a juror to speculate or precommit on how that juror might vote based on any particular facts.'" *State v. Smith*, 215 Ariz. 221, 231 ¶ 42 (2007) (quoting *United States v. McVeigh*, 153 F.3d 1166, 1207 (10th Cir. 1998)). Nor must a trial court allow a defendant to ask questions "designed to condition the jurors to damaging evidence expected to be presented at trial and to commit them to certain positions prior to receiving the evidence." *State v. Melendez*, 121 Ariz. 1, 3 (1978). Rather, "part of the guarantee of a defendant's right to an impartial jury is an *adequate voir dire* to identify unqualified jurors." *Morgan*, 504 U.S. at 729 (emphasis added); *see also Burns*, 237 Ariz. at 13 ¶ 21 (rejecting argument that *Morgan* entitles defendant "to ask whether [potential jurors] would impose the death penalty based on the specific facts of his case"). Here, Bush was allowed to question potential jurors on whether the anticipated evidence would prevent them from being fair and impartial.

¶37      In his voir dire questioning, Bush repeatedly referred to this case as involving "first degree, premeditated, cold-blooded, inexcusable murder" and vividly described the "gruesome photographs" and other

"gut-wrenching" evidence that would be presented. Because Bush's statements sufficiently informed the potential jurors about the graphic nature of the evidence in the case, exposing them to the 911 tape and photographs would have unnecessarily risked conditioning the jurors to the State's damaging evidence. *See Melendez*, 121 Ariz. at 3. As such, the trial court did not err in precluding Bush from presenting that evidence during voir dire.

### 4. Failure to Strike Jurors Sua Sponte

¶38 Bush argues that the trial court committed structural error and violated his rights "to due process and a fair trial by an impartial jury, and . . . to be free from cruel and unusual punishment" under the federal and Arizona constitutions by failing to strike sua sponte four allegedly "death-presumptive jurors" who served on the petit jury. Specifically, he contends the court erred by not striking Jurors 2, 3, 8, and 9 because they allegedly "made death-presumptive statements in their questionnaires for which they were never rehabilitated." We find no structural or other error.

¶39 During the jury selection process the trial court dismissed forty-five potential jurors for cause, including several whom Bush moved to strike because he believed they would automatically vote to impose a death sentence. Bush did not move to strike empaneled Jurors 2, 3, 8, or 9. But after voir dire he moved for a mistrial based "on the entire way [the jury selection] process has been conducted" and argued that some prospective, stealth jurors, without specifically identifying the four now in question, had "not been forthcoming with information" to shed light on some of their responses in the juror questionnaire. Bush made clear that his motion for mistrial was distinct from his request to strike certain specified prospective jurors he viewed as death-biased. The trial court denied Bush's motion, stating that jury selection "has been an effective process" that resulted in "a panel at this point that is fair and can be impartial and will follow the law."

¶40 We first reject Bush's assertion that the trial court's failure to sua sponte strike Jurors 2, 3, 8, and 9 resulted in structural error. *State v. Anderson* (*Anderson I*), 197 Ariz. 314 (2000), on which Bush relies, is inapposite. There, contrary to our rules and case law, the trial court refused the defendant's request for oral voir dire to rehabilitate prospective jurors who generally opposed the death penalty. *Id.* at 319 ¶ 10, 320–21 ¶¶ 13–14; *cf. Moore*, 222 Ariz. at 10–11 ¶¶ 41–42 (finding *Anderson I* "not analogous"

to situation where trial court failed "to specifically ask jurors if they could set aside their beliefs"). Here, in contrast, the trial court did not deny Bush his right to voir dire, let alone his right to strike jurors based on their allegedly death-presumptive statements. Nor did any of the jurors in question express a belief that "death should be imposed *ipso facto* upon conviction of a capital offense," *Morgan*, 504 U.S. at 735, or otherwise state that he or she would "automatically vote for the death penalty without regard to the mitigating evidence," *id.* at 738.

**¶41**      Bush alternatively argues that "[f]undamental error analysis does not apply here as [he] specifically objected to the court's voir dire as inadequate and moved for a mistrial." We disagree. Bush does not argue that the trial court erred in denying his motion for a mistrial. And that motion was, at best, a "general objection to death qualification," which is insufficient to preserve issues relating to the qualification of particular jurors. *E.g.*, *Moody*, 208 Ariz. at 449–50 ¶ 85. Furthermore, even assuming Bush's oral motion for a mistrial constituted a challenge to the panel, it failed to comply with Arizona Rule of Criminal Procedure 18.4(a), which at all relevant times required such challenges to be "in writing." We therefore review his claim for fundamental error, which requires Bush to show that the trial court's failure to sua sponte strike Jurors 2, 3, 8, and 9 constituted error that was fundamental and prejudicial. *Henderson*, 210 Ariz. at 567 ¶¶ 19–20; *see also Garza*, 216 Ariz. at 64 ¶¶ 28–29 (reviewing death-biased jury claims for fundamental error); *Bible*, 175 Ariz. at 573–74 (same).

**¶42**      "When there is reasonable ground to believe that a juror cannot render a fair and impartial verdict, the court, on its own initiative, . . . shall excuse the juror from service in the case." Ariz. R. Crim. P. 18.4(b) (2011); *see also Morgan*, 504 U.S. at 729 ("The Constitution . . . [requires] that the defendant be afforded an impartial jury."). But a potential juror is not precluded from jury service "[s]imply because [the] juror favors the death penalty" so long as the juror is "willing to put aside his opinions and base his decisions solely upon the evidence." *State v. Velazquez*, 216 Ariz. 300, 307 ¶ 19 (2007) (internal quotation marks omitted) (quoting *State v. Martinez*, 196 Ariz. 451, 459 ¶ 28 (2000)). Thus, whether fundamental error occurred turns on whether the trial court empaneled jurors who were unwilling to set aside their favorable views of the death penalty.

**¶43**      Jurors 2, 3, 8, and 9 each gave responses to some questions in the juror questionnaire that, viewed in isolation, arguably indicate

death-favorable views. But Bush's assertion that those jurors "were not asked any follow-up questions on [their] biases" is plainly incorrect. Several questions in the juror questionnaire asked the prospective jurors about their willingness and ability to set their beliefs and views aside and render a fair and impartial verdict based solely on the evidence presented at trial and the court's instructions on the law. Indeed, one of the questions in the juror questionnaire was nearly identical to the United States Supreme Court's *Witherspoon-Witt* standard for juror impartiality. *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Witherspoon v. Illinois*, 391 U.S. 510, 519–20 (1968).

¶44 Each of the four jurors in question here responded to these questions in a manner indicating they would be fair and impartial. Moreover, the questionnaire stated that jurors were "sworn and instructed to answer [the] questionnaire under oath," such that their "answers will have the effect of a statement given to the Court under oath." Considered in their entirety, the responses made by Jurors 2, 3, 8, and 9 to these questions indicated that, despite any potential bias in favor of, or misunderstanding of the law relating to, the death penalty, they were willing to set their views aside and render a fair and impartial verdict.

¶45 Bush's claims of juror ineligibility are premised on the mistaken assumption that these jurors' questionnaire responses exposed a death-favorable bias or mitigation impairment that could only be rehabilitated through voir dire. But it does not matter that the jurors' statements assuring their fairness and impartiality were in questionnaire responses. *See Velazquez*, 216 Ariz. at 307 ¶ 20 (rejecting a capital defendant's death-biased jury claim based, in part, on a juror's questionnaire response indicating that "he would not automatically impose a death sentence"). And *Anderson I* does not support Bush's contention that a "clear statement of willingness to set aside personal opinions and beliefs [must] appear in the *voir dire* record," as opposed to a juror questionnaire.

¶46 In any case, the relevant questionnaire responses are not the only evidence in the record of these jurors' fitness for service. During voir dire, the trial court, Bush, and the State explained multiple times the "three phases in a first degree murder trial where the State is seeking the death penalty" so as "to make sure that [each potential juror] fully understood what the jury's role would be in this case." This included detailed explanations of the aggravation and mitigation phases and repeated queries as to whether any prospective juror would "be unwilling or unable . . . to

listen to [Bush]'s mitigation . . . information." Indeed, during defense counsel's questioning of the potential jurors all jurors agreed that a life sentence, not a death sentence, is required for a "first degree, premeditated, cold-blooded, inexcusable murder" unless the State establishes one or more aggravating circumstances. Viewed in its entirety, the jury selection record confirms that "the presence or absence of . . . mitigating circumstances [was not] entirely irrelevant" to these jurors. *Morgan*, 504 U.S. at 729.

¶47 In sum, we find no merit to Bush's allegation that "no clear statement of willingness to set aside personal opinions and beliefs appears in the voir dire record." The trial court committed no error, let alone structural or fundamental error, in empaneling Jurors 2, 3, 8, and 9.

## C. Confession Issues

### 1. Admissibility of Evidence of Bush's Confession

¶48 Detective Navarro testified at trial that after Bush was arrested and received *Miranda* warnings, he voluntarily spoke with detectives for about four hours and, though initially denying any involvement, confessed to having shot the victims. Bush did not object to that testimony and did not cross-examine the detective. Nor did either party offer into evidence the video recording or written transcript of Bush's interrogation.

¶49 "To be admissible, a statement must be voluntary, not obtained by coercion or improper inducement." *State v. Ellison*, 213 Ariz. 116, 127 ¶ 30 (2006). Bush argues that his confession was involuntary because the State "extracted [it] using coercive promises" and because his "will was overborne by the State's coercive conduct." But at no point before or during trial did Bush move to suppress evidence of his statements, request a voluntariness hearing, or object to admission of his statements. He therefore forfeited his argument by failing to timely raise any issue about the voluntariness of his confession, as our procedural rules required. *See* Ariz. R. Crim. P. 16.1(b)–(c) (2011).

¶50 At all relevant times, Arizona Rule of Criminal Procedure 16.1(b) provided that all pretrial "motions shall be made no later than 20 days prior to trial, or at such other time as the court may direct." And Rule 16.1(c) provided that "[a]ny motion, defense, objection, or request not timely raised under Rule 16.1(b) shall be precluded, unless the basis thereof

was not then known, and by the exercise of reasonable diligence could not then have been known, and the party raises it promptly upon learning of it." The comment to the rule indicates that Rule 16.1(c) overruled *State v. Kananen*, 97 Ariz. 233 (1965), which held that "a defendant was *not* precluded by his failure to make a pretrial suppression motion from objecting to the admission of illegally-obtained evidence at trial." Ariz. R. Crim. P. 16.1 cmt. (2011) (emphasis added).

**¶51** Bush does not argue that his failure to move to suppress his statements, request a voluntariness hearing, or object to Detective Navarro's trial testimony about Bush's confession was based on evidence that "was not then known" or that "could not then have been known" if he exercised "reasonable diligence" to discover it. Ariz. R. Crim. P. 16.1(c) (2011). Therefore, Bush forfeited any argument that his confession was involuntary. *Cf. United States v. Wright*, 215 F.3d 1020, 1026 (9th Cir. 2000) (declining to reach the merits of defendant's argument challenging the legality of his arrest "because he failed to raise the issue of his allegedly illegal arrest in a pre-trial suppression motion" in contravention of Federal Rule of Criminal Procedure 12(b)(3) and noting that Rule 12(f) provided that the "failure to bring a timely suppression motion constitute[d] a waiver of the issue").

**¶52** Likewise, although Bush argues in his supplemental opening brief that the prosecutor engaged in misconduct by eliciting (and later arguing) evidence of Bush's confession through Detective Navarro's testimony, Bush did not object to that testimony or to any alleged prosecutorial misconduct in the trial court. Bush therefore forfeited his claim of prosecutorial misconduct absent fundamental error, which he fails to establish here. *See State v. Montano*, 204 Ariz. 413, 427 ¶ 70 n.6 (2003).

### 2. Bush's Right to a Voluntariness Hearing

**¶53** In a related argument, Bush contends the trial court erred in failing to sua sponte conduct a hearing to determine whether his confession was voluntary. We disagree.

**¶54** A defendant "objecting to the admission of a confession" has a constitutional right grounded in the Fourteenth Amendment's Due Process Clause "to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined." *Jackson v. Denno*, 378 U.S. 368, 380 (1964). But the United

States Constitution "does not require a voluntariness hearing absent some contemporaneous challenge to the use of the confession." *Wainwright v. Sykes*, 433 U.S. 72, 86 (1977). Because Bush did not move to suppress evidence of his statements to law enforcement, request a voluntariness hearing, or object to Detective Navarro's trial testimony, the trial court was not required to hold a voluntariness hearing. Bush neither presented any evidence nor argued to the jury that his confession was involuntary. Nonetheless, for reasons that are unclear, the trial court (without objection) instructed the jury in the guilt phase to "not consider any statements made by the defendant to a law enforcement officer" unless the jurors "determine beyond a reasonable doubt that the defendant made the statements voluntarily."

¶55        In *Jackson*, the United States Supreme Court concluded that the defendant in that case had a due process right to a voluntariness hearing. 378 U.S. at 391. The Court reasoned that, although defense counsel "did not specifically object to the admission of the confession initially, the trial court indicated [during trial] its awareness that [defense] counsel was questioning the circumstances under which [the defendant] was interrogated." *Id.* at 374. Later, in *Wainwright*, the Court stated that a defendant does not have a right "to a hearing as to the voluntariness of a confession" when he "does not object to its admission." 433 U.S. at 86. The Court explained that "the [*Jackson*] defendant's objection to the use of his confession was brought to the attention of the trial court" and nothing in that "opinion suggests that a hearing would have been required even if it had not been." *Id.*; *see also State v. Alvarado*, 121 Ariz. 485, 487 n.2 (1979) (stating that in *Jackson* the defendant "never specifically objected that his confession was involuntary," but that *Wainwright* "interprets the [*Jackson*] defendant's line of questioning . . . as having been the functional equivalent of an objection").

¶56        Bush argues that the trial court violated his due process right to a voluntariness hearing because in a pretrial motion to continue he raised a "general challenge," consistent with *Jackson*, about the voluntariness of his confession. We disagree.

¶57        In his motion to continue, Bush requested additional time to undergo psychological testing and to investigate evidence that he might present for mitigation purposes. Bush vaguely stated in the motion that he had "serious question[s]" "in his own mind" about whether he "did" confess or "intended" to confess. This unclear, isolated statement in a single

pretrial motion unrelated to voluntariness is plainly not a "contemporaneous challenge to the use of the confession," *Wainwright*, 433 U.S. at 86, or a "functional equivalent of an objection," *Alvarado*, 121 Ariz. at 487 n.2. Accordingly, the trial court did not violate Bush's due process rights by not holding a voluntariness hearing sua sponte.

**¶58** Bush relatedly asserts that the trial court violated Arizona law "by failing, sua sponte, to conduct a voluntariness hearing before submitting evidence of Bush's confession to the jury." Again, we disagree.

**¶59** In a line of post-*Jackson* but pre-*Wainwright* cases, this Court variously stated that a trial court must hold a voluntariness hearing if a defendant objects to the use of a confession *or* when the evidence raises a question about the voluntariness of a confession. *See State v. Finn*, 111 Ariz. 271, 275 (1974) (stating that a trial court is not required to order a voluntariness hearing sua sponte when "the question of voluntariness is not raised either by the evidence or the defense counsel"); *State v. Armstrong*, 103 Ariz. 280, 281 (1968) (stating that "[i]t is the duty of a trial court to hold a hearing as to voluntariness of a statement or confession, if a question as to its voluntariness is raised — either by the attorneys, or one is presented by the evidence" (quoting *State v. Goodyear*, 100 Ariz. 244, 248 (1966))); *State v. Simoneau*, 98 Ariz. 2, 7 (1965) (stating that "where no question is presented to the court either by counsel or by the evidence at the trial suggesting that a confession is involuntary, there is no issue of fact to be determined by the court in the absence of the jury and no need for a specific ruling" and noting that even a "slight suggestion" arising from the evidence "is sufficient to raise an issue").

**¶60** Although none of these cases clearly identifies the source of the supposed duty when a question of voluntariness is "presented by the evidence" and not by the defendant, *Armstrong*, 103 Ariz. at 281, at least two of the cases — *Armstrong* and *Simoneau* — imply that the source of this rule is the Fourteenth Amendment's Due Process Clause, *see id.* (noting immediately before announcing the rule that this rule arose "[a]fter the opinion" in *Jackson*); *Simoneau*, 98 Ariz. at 6 (citing *Jackson* in the same paragraph as the rule and also citing *State v. Owen*, 96 Ariz. 274 (1964), the first case in which we interpreted *Jackson*).

**¶61** As noted above, however, the Supreme Court in *Wainwright* clarified the *Jackson* rule and rejected the interpretation of *Jackson* that we applied in this older line of cases. Indeed, after *Wainwright* we concluded

in *Alvarado* that "the defendant . . . must move for a voluntariness hearing." 121 Ariz. at 487. But we did not address, reference, or otherwise evaluate the continuing validity of our pre-*Wainwright* cases. Therefore, we now disavow any statements in those cases that are inconsistent with *Wainwright* or *Alvarado*.

**¶62** Bush does not argue that any Arizona constitutional provision or statute requires a trial court to sua sponte hold a voluntariness hearing when a question regarding the voluntariness of a defendant's confession is only arguably raised by the evidence. Bush cites A.R.S. § 13-3988(A) in passing, but that statute does not support his argument. Section 13-3988(A) provides that before a "confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any *issue* as to voluntariness." (emphasis added). We interpret this statute to mean that, consistent with *Wainwright* and *Alvarado*, a trial court must address the issue of voluntariness if a defendant raises it. Our interpretation of Supreme Court precedent, our previous opinions that analyze this issue, and § 13-3988(A) harmonize a defendant's due process rights with the procedural requirements necessary to effectuate those rights. Simply put, § 13-3988(A) does not create a substantive right to a sua sponte voluntariness hearing when a question as to voluntariness is merely raised by the evidence. (On the other hand, if a trial court is aware of facts indicating that a confession was involuntary, the court, in its discretion and even absent a request, may order a voluntariness hearing.) Therefore, on this record, we reject Bush's argument that Arizona law required the trial court to sua sponte conduct a voluntariness hearing.

### D. Alleged *Simmons* Error

**¶63** Bush contends the trial court committed error under *Simmons v. South Carolina*, 512 U.S. 154 (1994), by failing to inform the jury that he would not be eligible for release if sentenced to life imprisonment. Bush further contends that *Simmons* error is structural and requires automatic reversal or, alternatively, that the error in this case was not harmless. The State counters that fundamental error review applies, noting that Bush failed to object below to any alleged *Simmons* error arising from the trial court's jury instructions.

**¶64** Right before jury selection began, Bush belatedly objected to a statement in the juror questionnaire that referred to a life sentence with the possibility of release after twenty-five, rather than thirty-five, years. In

the ensuing discussion, Bush stated without elaboration that he did "not agree the jury should be even advised as to the possibility of release," and assured the trial court he would follow up on that point later.  He never did.  The trial court, after denying Bush's oral motion for a mistrial on a different ground, and without objection, instructed the first pool of prospective jurors that if they were to find the defendant guilty, find one or more aggravating circumstances, but nonetheless "unanimously agree[] that . . . life in prison is the appropriate sentence, the Court will sentence the defendant to either life imprisonment without the possibility of release or life without the possibility of release until at least 35 calendar years have been passed [sic]."  The court repeated that same incorrect instruction the next day, again without objection, before a different panel of prospective jurors.  The voir dire process then began, the petit jurors were selected, and the jury found Bush guilty on all charges.

¶65        At the beginning of the aggravation phase nine days later, the trial court instructed the jury about possible sentences Bush faced if the jurors found one or more aggravating circumstances.  The court explained that if the jury returned a life sentence, "then the judge will sentence [Bush] to either life imprisonment without the possibility of release or life imprisonment with the possibility of release after 35 years."  "Life without possibility of release from prison," the court stated, "means . . . [Bush] would never be eligible to be released from prison for any reason for the rest of his life."  Although Bush objected to this instruction, he did so only to "the order in which [the potential sentences] are put."

¶66        Unless *Simmons* error is structural, Bush's failure to object on *Simmons* grounds at trial limits our review to fundamental error.  *State v. Valverde*, 220 Ariz. 582, 584–85 ¶¶ 9–12 (2009).  Bush contends that *Simmons* error is structural because it "undermine[s] confidence in the . . . outcome of the proceeding."  But the "relatively few instances in which we . . . regard error as structural" all involve errors that "deprive defendants of 'basic protections'" and infect "'the entire trial process' from beginning to end," and include "errors such as a biased trial judge [and the] complete denial of criminal defense counsel."  *State v. Ring* (*Ring III*), 204 Ariz. 534, 552–53 ¶¶ 45–46 (2003) (quoting *Neder v. United States*, 527 U.S. 1, 8 (1999)); *cf. McCoy v. Louisiana*, 138 S. Ct. 1500, 1511 (2018) ("Structural error 'affect[s] the framework within which the trial proceeds,' as distinguished from a lapse or flaw that is 'simply an error in the trial process itself.'" (alteration in original) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991))).

**¶67** *Simmons* error, in contrast, occurs only "whenever future dangerousness is at issue in a capital *sentencing* proceeding," *Shafer v. South Carolina*, 532 U.S. 36, 51 (2001) (emphasis added), and neither "deprive[s] defendants of 'basic protections'" nor infects "'the entire trial process' from beginning to end," *see Ring III*, 204 Ariz. at 552–53 ¶¶ 45–46 (quoting *Neder*, 527 U.S. at 8); *cf. O'Dell v. Netherland*, 521 U.S. 151, 167 (1997) (describing *Simmons* as a "narrow right of rebuttal" available "in a limited class of capital cases" and rejecting argument that *Simmons* embodied a "watershed rule[] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding" (internal quotation marks and citations omitted)). In addition, "harmless-error analysis when errors have occurred in a capital sentencing proceeding . . . [is] constitutionally permissible." *Clemons v. Mississippi*, 494 U.S. 738, 754 (1990). That some courts have reviewed alleged *Simmons* error for harmlessness further undermines Bush's claim that such error is structural. *See, e.g.*, *Richmond v. Polk*, 375 F.3d 309, 334–36 (4th Cir. 2004); *State v. Loftin*, 680 A.2d 677, 715 (N.J. 1996). We therefore hold that *Simmons* error is not structural.

**¶68** Accordingly, we review Bush's *Simmons* claim for fundamental error. *See State v. Hargrave*, 225 Ariz. 1, 14 ¶¶ 50–51 (2010) (reviewing defendant's *Simmons* argument for fundamental error when he failed to object to trial court's possibility-of-release instruction).

> To establish fundamental error, a defendant must show that (1) an error occurred; (2) the error goes "to the foundation of the case, . . . takes from the defendant a right essential to his defense, [or is] of such magnitude that the defendant could not possibly have received a fair trial"; and (3) the error prejudiced the defendant.

*Naranjo*, 234 Ariz. at 246 ¶ 58 (alteration in original) (quoting *Henderson*, 210 Ariz. at 567 ¶¶ 19–20). We first address whether Bush has met his burden to establish that *Simmons* error occurred. *Id.*; *see also Henderson*, 210 Ariz. at 568 ¶ 23 ("To obtain relief under the fundamental error standard of review, [the defendant] must first prove error.").

**¶69** Under *Simmons* and its progeny, including *Lynch v. Arizona* (*Lynch II*), 136 S. Ct. 1818 (2016), when a parole-ineligible defendant's "future dangerousness [is] at issue," due process entitles him to "inform the jury of his parole ineligibility." *Simmons*, 512 U.S. at 171 (plurality opinion). Bush argues that the trial court's possibility-of-release instruction falls

squarely within *Simmons* and violates his due process rights because "the correct information regarding [his] parole ineligibility [was] withheld from the jury," and "the jurors were repeatedly told that [he] was in fact eligible for release."

¶70 Although the trial court's jury instruction referring to the possibility of release conformed to this Court's prior and then-applicable case law, *see, e.g.*, *Hargrave*, 225 Ariz. at 14–15 ¶¶ 50–53, the instruction apparently was incorrect under the Supreme Court's subsequent opinion in *Lynch II*, 136 S. Ct. at 1818–20 (reversing *State v. Lynch*, 238 Ariz. 84, 103 ¶ 65 (2015), which found no *Simmons* error when trial court "properly instructed the jury" that court "could impose a release-eligible sentence if the jury did not return a death verdict"). Nonetheless, we disagree with Bush's assertion that fundamental *Simmons* error occurred.

¶71 Bush urges us to adopt a broader interpretation of *Simmons* than the United States Supreme Court itself applies. In *Simmons*, four Justices joined the Court's plurality holding that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." 512 U.S. at 156 (plurality opinion). The plurality explained that "due process plainly requires that [the defendant] be allowed to bring [his parole ineligibility] to the jury's attention by way of argument by defense counsel or an instruction from the court" in order to "'deny or explain' the [state's] showing of future dangerousness." *Id.* at 169 (quoting *Gardner v. Florida*, 430 U.S. 349, 362 (1977)); *see also O'Dell*, 521 U.S. at 159 (noting that in *Simmons* "there was no opinion for the Court" and that four Justices merely "concluded that the Due Process Clause required allowing the defendant to inform the jury — through argument or instruction — of his parole ineligibility in the face of a prosecution's future dangerousness argument").

¶72 Justice Ginsburg (who joined the Court's plurality opinion) wrote a separate concurrence, as did Justice O'Connor (who did not join the plurality but separately concurred in the judgment, with Chief Justice Rehnquist and Justice Kennedy joining her opinion). Justice Ginsburg's separate opinion in *Simmons* clarified that, in her view, "due process does not dictate that the judge herself, rather than defense counsel, provide the [parole ineligibility] instruction." 512 U.S. at 174 (Ginsburg, J., concurring). Justice O'Connor further clarified that when the prosecution seeks to show a parole-ineligible defendant's future dangerousness, "the defendant

should be allowed to bring his parole ineligibility to the jury's attention —
by way of argument by defense counsel or an instruction from the court —
as a means of responding to the State's showing of future dangerousness."
*Id.* at 177 (O'Connor, J., concurring in the judgment). Under those
circumstances, Justice O'Connor stated, "due process entitles the defendant
to inform the capital sentencing jury — by either argument or instruction —
that he is parole ineligible." *Id.* at 178.

¶73 Justice O'Connor's opinion represents "the narrowest
ground[]" that "may be viewed as [the] position taken by" the Court on the
issue of what due process requires in this context. *Marks v. United States*,
430 U.S. 188, 193 (1977) (internal quotation marks omitted) (quoting *Gregg
v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (joint opinion of Stewart, Powell,
and Stevens, JJ.)); *State v. Medina*, 232 Ariz. 391, 406 ¶ 57 (2013). Thus, the
due process right under *Simmons* merely affords a parole-ineligible capital
defendant the right to "rebut the State's case" (if future dangerousness is at
issue) by informing the jury that "he will never be released from prison" if
sentenced to life. *Simmons*, 512 U.S. at 177 (O'Connor, J., concurring in the
judgment).

¶74 The Supreme Court's subsequent cases, other federal
decisions, and this Court's opinions support that narrow interpretation of
*Simmons*. *See, e.g., Lynch II*, 136 S. Ct. at 1818 (describing *Simmons* as
entitling the defendant to inform the jury, through instruction or argument,
of his parole ineligibility); *O'Dell*, 521 U.S. at 167 (describing *Simmons* as
providing a "narrow right of rebuttal"); *Townes v. Murray*, 68 F.3d 840, 850
(4th Cir. 1995) ("[T]he defendant's right, under *Simmons*, is one of
opportunity, not of result."); *State v. Hulsey*, 243 Ariz. 367, 396 ¶ 138 (2018)
(same); *cf. State v. Escalante-Orozco*, 241 Ariz. 254, 285 ¶ 118 (2017)
(suggesting that *Simmons* error is waivable). Furthermore, in every case in
which the Supreme Court or this Court has found reversible *Simmons* error,
the trial court either rejected the defendant's proposed jury instruction
regarding his ineligibility for parole, prevented defense counsel "from
saying anything to the jury about parole ineligibility," or both. *Simmons*,
512 U.S. at 175 (Ginsburg, J., concurring); *accord, e.g., Lynch II*, 136 S. Ct. at
1819 (both); *Kelly v. South Carolina*, 534 U.S. 246, 249 (2002) (refusal to
inform); *Shafer*, 532 U.S. at 41–46 (both); *Hulsey*, 243 Ariz. at 394 ¶¶ 124–27
(both); *State v. Rushing*, 243 Ariz. 212, 221 ¶ 36 (2017) (refusal to inform);
*Escalante-Orozco*, 241 Ariz. at 284 ¶ 116 (refusal to inform). In short,
*Simmons* "relief is foreclosed by [the defendant]'s failure to request a parole

ineligibility instruction at trial." *Campbell v. Polk*, 447 F.3d 270, 289 (4th Cir. 2006); *accord Townes*, 68 F.3d at 850.

**¶75**  Here, Bush has not shown that he was deprived of the right to inform the jury of his parole ineligibility. Unlike in the aforementioned cases, the trial court neither refused to instruct, nor prevented Bush from informing, the jury regarding his parole ineligibility. To the extent defense counsel briefly and vaguely voiced disagreement before jury selection over whether jurors should "be advised as to the possibility of release," and despite stating he would "talk more about that" disagreement "in a second," he failed to do so that day or at any time during trial. Thus, Bush has not established *Simmons* error. Accordingly, we do not address whether future dangerousness, a prerequisite to finding reversible *Simmons* error, was at issue in this case, *Lynch II*, 136 S. Ct. at 1818; *Simmons*, 512 U.S. at 156 (plurality opinion); *Simmons*, 512 U.S. at 177–78 (O'Connor, J., concurring in the judgment), nor do we address whether Bush has carried his burden of establishing prejudice resulting from any alleged *Simmons* error. *See Henderson*, 210 Ariz. at 567 ¶ 20, 568–69 ¶¶ 26–28.

### E. Victim-Impact Evidence

**¶76**  Bush contends the trial court abused its discretion by allowing Gina, the surviving victim, to make an impact statement allegedly containing impermissible characterizations and opinions about Bush and the murders, which he claims served no purpose other than to inflame the jury and inject non-statutory aggravation evidence into the proceedings. Bush further argues that the victim-impact evidence violated his Fifth Amendment privilege against self-incrimination and amounted to prosecutorial misconduct.

**¶77**  After the aggravation phase and before Bush presented his mitigation evidence, Gina read a prepared statement describing the impact of her husband's and daughter's murders as the prosecution displayed seven portrait-type photographs of Brisenia. The State noted that these were the "same photographs that Ms. Gonzales used" in Forde's trial, and the trial court informed the jury that Gina would not be under oath and that hers "is a statement of the victim . . . not subject to cross examination."

**¶78**  Gina's impact statement largely described the two murders from her perspective, her and her surviving daughter's struggles to understand and cope with losing her husband and daughter, and those

victims' individual characteristics. Gina did, however, state that her "daughter was shot at close range, like she was worth nothing," and "[c]lose enough to almost blow her face completely off." She also stated that Bush "lied" to Brisenia and "knew what his intentions were," and expressed confusion about "how someone could have that much hate in their heart."

¶79 Bush did not object until several days after Gina gave her statement, when he submitted limiting instructions and moved for a mistrial. He alleged the statement violated *Payne v. Tennessee*, 501 U.S. 808 (1991), and *Booth v. Maryland*, 482 U.S. 496 (1987), because it was "clearly directed toward the defendant" and did not "deal[] with the victim." The trial court denied Bush's motion for a mistrial but agreed to give a "cautionary instruction" directing jurors to consider Gina's statement only "as it relates to the personal characteristics and uniqueness of the victims and the impact of their deaths on the victims' family," and to disregard any portion "that may relate to her opinion of the crime or [Bush]."

¶80 We review the denial of a motion for a mistrial for abuse of discretion. *Burns*, 237 Ariz. at 29 ¶ 136. A victim has the right "[t]o be heard at any proceeding involving . . . sentencing." Ariz. Const. art. 2, § 2.1(4). Impact statements provide "evidence about the victim and . . . the impact of the murder on the victim's family," *Payne*, 501 U.S. at 827, help inform the jury about the "specific harm caused by the crime in question," *id.* at 825, and rebut mitigation evidence "by reminding the [jury] that . . . the victim is an individual whose death represents a unique loss to society and . . . to his family," *id.* (internal quotation marks omitted) (quoting *Booth*, 482 U.S. at 517 (White, J., dissenting)).

¶81 Victim-impact evidence is subject to constitutional limitations. The Eighth Amendment, for example, prohibits victim-impact statements from containing "victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence." *Id.* at 830 n.2; *accord Booth*, 482 U.S. at 508. Likewise, due process principles prohibit impact evidence that "is 'so unduly prejudicial that it renders the trial fundamentally unfair.'" *State v. Dann*, 220 Ariz. 351, 369 ¶ 98 (2009) (quoting *Payne*, 501 U.S. at 825).

¶82 We cannot say Gina's statements were unduly prejudicial. She did not advocate for the death penalty, *see State v. Carlson*, 237 Ariz. 381, 397 ¶¶ 59–61 (2015), and her statements are no more problematic than

others this Court has found permissible, *see, e.g.*, *Burns*, 237 Ariz. at 30 ¶ 141 (describing victim's final moments was "not unduly prejudicial"); *State v. Rose*, 231 Ariz. 500, 513 ¶ 57 (2013) (finding "cop killer" a permissible statement); *State v. Cota*, 229 Ariz. 136, 150 ¶¶ 69–72 (2012) (describing the victims' bodies as "mutilated" and "tortured" permissible). Moreover, we concluded in *Forde* that Gina's similar statement in that case appropriately conveyed her inability to comprehend the killings. 233 Ariz. at 570 ¶¶ 113–14.

¶83 We also reject Bush's challenge to a photo presentation that pales in comparison to the 123-photograph presentation we upheld in *Burns*, based partially on a limiting instruction like the one given here. 237 Ariz. at 29–30 ¶¶ 137–40. In short, the trial court did not abuse its discretion in denying his motion for a mistrial.

¶84 Bush next argues that the State committed prosecutorial misconduct amounting to prejudicial fundamental error when it introduced (and later argued) Gina's statements describing how Bush bragged about the killings and retained a bullet from the crime scene as a souvenir. Because Bush failed to object to the alleged prosecutorial misconduct, our analysis is limited to fundamental error review. *Cota*, 229 Ariz. at 151 ¶ 79.

¶85 We find no evidence of prosecutorial misconduct in the record. As Bush concedes, the prosecution did not allege, and the jury was not instructed on, the relishing aggravator, and "[n]one of [Gina's] statements encouraged the jury to consider unproven aggravators." *Id.* ¶ 80. Furthermore, the trial court dispelled any lingering concern by instructing the jury it may not consider Gina's statement as aggravation. *See id.* at 150 ¶ 72 (upholding a similar instruction).

¶86 We likewise reject Bush's claim that the prosecution committed misconduct when it "orchestrat[ed] the victim impact presentation" that was "virtually identical" to that given in *Forde*, such that Gina was "not simply speaking extemporaneously." Because *Forde* involved the same facts as this case, Gina's impact statement was unsurprisingly similar in both cases.

¶87 Bush also contends that Gina violated his Fifth Amendment privilege against self-incrimination and Sixth Amendment Confrontation Clause rights when she "directly addressed [him] . . . in open court, thereby

calling for an answer." We rejected this argument in *Forde*, 233 Ariz. at 570 ¶¶ 113–14, and Bush concedes that Gina's statement in that case is "virtually identical" to the statement she made in this case.

## F. Double Punishment

¶88 Bush argues that the sentences for his non-capital convictions constitute impermissible double punishment. Although Bush's failure to object to his sentences in the trial court limits our analysis to fundamental error review, an illegal sentence constitutes fundamental error. *Forde*, 233 Ariz. at 574 ¶ 137.

¶89 Bush was sentenced to a total of seventy-eight years' imprisonment: twenty-one years for first degree burglary (count three); twenty-one years for attempted first degree murder (count four); fifteen years for aggravated assault (count five); fifteen years, to run concurrently with his sentence for count five, for aggravated assault with a deadly weapon (count six); twenty-one years for armed robbery with a deadly weapon (count seven); and fifteen years, to run concurrently with his sentence for count seven, for aggravated robbery while aided by one or more accomplices (count eight).

¶90 Under Arizona law, "[a]n act or omission . . . made punishable in different ways by different sections of the laws may be punished under both, but in no event may sentences be other than concurrent." A.R.S. § 13-116. We apply a three-part test to determine whether a defendant's conduct constitutes a single "act or omission" under the statute. *State v. Gordon*, 161 Ariz. 308, 315 (1989). Under *Gordon*, we first "subtract[] from the factual transaction the evidence necessary to convict on the ultimate charge" — here, the murders (as to Brisenia and Junior) and attempted murder (as to Gina) — and then determine whether "the remaining evidence satisfies the elements of the other crime[s]." *Id.* We then determine "whether . . . it was factually impossible to commit the ultimate crime without also committing the secondary crime[s]." *Id.* Finally, we "consider whether the defendant's conduct in committing the [secondary] crime[s] caused the victim to suffer an additional risk of harm beyond that inherent in the ultimate crime." *Id.*

¶91 Bush's sentences for his non-capital convictions satisfy *Gordon*. His conviction for burglary (count three) satisfies the identical elements test relative to, and was not a necessary component of, his murder

convictions, and subjected his victims to a distinct form of harm — violation of privacy and security — different than loss of life. *Compare* A.R.S. § 13-1508, *with* § 13-1105. Bush further contends that his sentence for count three must run concurrent with his sentence for count four because the burglary did not subject Gina to an additional risk of harm beyond the attempted murder, but this claim fails for the same reason.

¶92 Bush's convictions for aggravated assault (counts five and six) also satisfy the identical elements test as they relate to his attempted murder conviction (count four). Bush nonetheless argues that his sentences for those counts must be concurrent with his attempted murder sentence because the harm inherent to aggravated assault is no different than the harm inherent to attempted murder. We rejected a similar claim in *Forde*, noting that the "aggravated assault convictions were established by evidence that Bush shot Gina twice and seriously injured her soon after he initially entered the home," and that the "attempted murder conviction was established by evidence that at the conclusion of the home invasion, Forde discovered Gina on the phone and shouted for someone to 'finish [her] off,' prompting Bush to re-enter the home and shoot at Gina." 233 Ariz. at 574 ¶ 138 (alteration in original). We also noted that the "attempted murder and aggravated assaults occurred at different times during the home invasion and involved separate acts," such that "it was possible . . . to commit the former crime without committing the latter ones." *Id.* ¶ 139. Finally, we concluded that "the aggravated assaults caused Gina to suffer physical injuries that were not inherent in the attempted murder." *Id.* Because the facts in this case and *Forde* are identical, Bush's claim necessarily fails.

¶93 Finally, Bush contends that his sentences for robbery and aggravated robbery (counts seven and eight), which run concurrently with each other, must also run concurrently with his sentence for attempted murder (count four). But these counts also satisfy the identical elements test because the elements of the relevant crimes, as with the facts underlying those crimes, are not identical. Indeed, Bush and his accomplices ransacked Gina's home after the initial shootings and before Bush returned, at Forde's command, to kill Gina. Moreover, robbery involves the unlawful taking of another's possessions, which is a harm distinct from an unjustified attempt to kill. *Compare* A.R.S. §§ 13-1902, -1903, *with* §§ 13-1001, -1105. As such, the consecutive sentences do not violate § 13-116, and the trial court did not err in sentencing Bush on these counts.

### G. Abuse of Discretion Review

¶94        We review the jury's imposition of a death sentence for abuse of discretion.  A.R.S. § 13-756(A).  Arizona law requires us to "review the sentencing portion of the trial even when a defendant fails," as Bush did here, "to challenge the jury's decision with regard to either the aggravating factors or the imposition of the death sentences."  *State v. Morris*, 215 Ariz. 324, 340 ¶¶ 75–76 (2007); *accord* § 13-756(A).  "A finding of an aggravating circumstance is not an abuse of discretion if there is 'any reasonable evidence in the record to sustain it.'"  *State v. Manuel*, 229 Ariz. 1, 9 ¶ 42 (2011) (quoting *Morris*, 215 Ariz. at 341 ¶ 77).  Moreover, "[t]he jury's determination that death is the appropriate sentence will not be reversed 'so long as any reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency.'"  *Id*. (quoting *Morris*, 215 Ariz. at 341 ¶ 81).

#### 1. Aggravating Circumstances

¶95        For Brisenia's murder, the prosecution alleged, and the jury found, that Bush "was an adult at the time" he murdered Brisenia, who "was under fifteen years of age," which is an aggravating circumstance under A.R.S. § 13-751(F)(9).  For both murders, the prosecution alleged, and the jury found, that Bush committed multiple homicides on the same occasion and after having been convicted of another serious offense "committed on the same occasion as the homicide[s]," which are aggravating circumstances under § 13-751(F)(2) and (8).  Sufficient evidence supports the jury's finding of the aggravating circumstances.

#### 2. Mitigating Circumstances

¶96        Bush presented evidence of significant mental illness, a severely troubled past, and a "very strong" "delusional system" involving his military background.  His mitigation expert, however, acknowledged that Bush likely had the capacity to "know right from wrong" and that it "was not typical for anyone to murder a nine year old girl."  And to the extent that Bush offered evidence that he may have had militaristic delusions, his expert also acknowledged that Bush was candid with him about his background and never described any such delusions.  Furthermore, the prosecution offered evidence that doctors in another state evaluated Bush for two weeks in 1998 and concluded that he, "although claiming mental illness, . . . was not mentally ill" and "was prone to

attempt[] to manipulate others" in order to "gain preferential treatment in prison."

### 3. Propriety of Death Sentences

¶97        Given the aggravating circumstances and the mitigation presented, a reasonable juror could conclude that the mitigating circumstances were not sufficiently substantial to call for leniency. Accordingly, the jury did not abuse its discretion in returning death verdicts for Bush's murders of Brisenia and Junior Flores.

## H. Additional Issues

¶98        Stating that he wants to preserve certain "constitutional challenges to his death sentences" based on claims that "have previously been rejected by this Court or the federal courts," Bush lists nineteen claims and previous decisions rejecting them. We decline to revisit those claims.

## I. The Dissent

¶99        Judge Winthrop's partial dissent asserts that the death penalty currently is "both cruel and unusual" and therefore unconstitutional under article 2, section 15 of the Arizona Constitution, this state's counterpart to the Eighth Amendment's "cruel and unusual punishment" clause. *Infra* ¶¶ 120, 136, 149 (Winthrop, J., concurring in part and dissenting in part). We do not directly address that assertion because well-established jurisprudential and procedural principles, as well as constitutional constraints on our proper role as state court jurists under Arizona's separation of powers, prohibit us from overturning this state's capital scheme, at least in this case.

¶100       The dissent is odd on several levels. It purportedly rests on the Arizona Constitution's prohibition of cruel and unusual punishment because, as the dissent acknowledges, binding United States Supreme Court precedent has rejected Eighth Amendment challenges to the death penalty. *Infra* ¶¶ 120, 131. Strangely, however, the dissent disregards our state's pertinent history and case law directly bearing on article 2, section 15, and instead relies largely on Supreme Court cases — mostly dissenting and other non-majority opinions — interpreting the Eighth Amendment to support its view. *See infra* ¶¶ 124, 126, 129–30, 136. This approach is fruitless.

¶101 The United States Supreme Court has not suggested that Arizona's capital sentencing scheme is unconstitutional, whether in cases involving our statutes or similar statutes of other states. Indeed, the Court recently declined to directly address, invalidate, or even question this state's capital sentencing statutes. *Hidalgo v. Arizona*, 138 S. Ct. 1054 (2018). To be sure, Justice Breyer has noted "a possible constitutional problem" with Arizona's statutory scheme based on its extensive list of aggravating circumstances, *id.* at 1057 (Breyer, J., respecting the denial of certiorari), a concern the dissent apparently shares, *infra* ¶ 120 n.1. But Justice Breyer's previously announced view that "it [is] highly likely that the death penalty violates the Eighth Amendment" is not the view of a majority of Justices and thus is not the law. *Glossip v. Gross*, 135 S. Ct. 2726, 2776–77 (2015) (Breyer, J., dissenting).

¶102 As the dissent correctly notes, over forty years ago the Supreme Court "essentially reaffirm[ed] the constitutionality of the death penalty throughout the nation." *Infra* ¶ 131; *see also Glossip*, 135 S. Ct. at 2732 (stating that "*Gregg* reaffirmed that the death penalty does not violate the Constitution" and that "it is settled that capital punishment is constitutional"); *Gregg*, 428 U.S. at 187, 207 (joint opinion of Stewart, Powell, and Stevens, JJ.); *Gregg*, 428 U.S. at 207, 220–26 (White, J., concurring in the judgment). In the four decades since, the Court has not found capital punishment unconstitutional under the Eighth Amendment, whether based on "the evolving standards of decency that mark the progress of a maturing society," *infra* ¶ 122 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion)), or otherwise.

¶103 As state court judges, we of course are bound by that authority under the Supremacy Clause. U.S. Const. art. VI, cl. 2 (stating that the federal "Constitution . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby"); *see also* Ariz. Const. art. 2, § 3(A) (stating that "[t]he Constitution of the United States is the supreme law of the land"). We therefore cannot interpret the federal Constitution to be more restrictive than has the Supreme Court on issues that Court has directly addressed. *See, e.g.*, *Arkansas v. Sullivan*, 532 U.S. 769, 772 (2001) (rejecting a state court's holding that "it may interpret the United States Constitution to provide greater protection than [the] Court's own federal constitutional precedents provide"); *accord Oregon v. Hass*, 420 U.S. 714, 719 (1975). Nor may we anticipate or assume that the Supreme Court will overturn or alter its established precedent. *See Hohn v. United States*, 524

U.S. 236, 252–53 (1998) (stating that the Court's "decisions remain binding precedent" until the Court "see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality"); *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (stating that it is the "Court's prerogative alone to overrule one of its precedents"). Thus, the dissent rightly acknowledges that this Court has no basis to declare Arizona's capital scheme invalid under the United States Constitution. *Infra* ¶ 120.

¶104 The dissent ostensibly relies on article 2, section 15 of the Arizona Constitution to support its view, but for several reasons that reliance is misplaced here. First and foremost, that issue is not properly before us as Bush did not raise it in the trial court or here on appeal. We generally do not address issues not properly raised, developed, and argued by the parties (and certainly would not do so here but for the dissent). *See State v. McCall*, 139 Ariz. 147, 163 (1983) (stating in a capital case that "[f]ailure to argue a claim constitutes abandonment"); *see also* Ariz. R. Crim. P. 31.10(a)(7)(A) (requiring appellant's brief to contain specific contentions with supporting reasons, legal authorities, and record references); *State ex rel. Brnovich v. City of Tucson*, 242 Ariz. 588, 599 ¶ 45 (2017) ("We generally do not reach out to decide important constitutional issues or to upset established precedent when no party has raised or argued such issues.").

¶105 The dissent is flawed in other respects as well. This Court of course may independently interpret and apply provisions of the Arizona Constitution in a manner that affords greater protection to individual rights than their federal counterparts. *See, e.g.*, *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 293 (1982) (citing William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489 (1977)). But any such analysis must be anchored in the text, history, and considered interpretation of the state constitutional provision in question. The dissent is untethered to any of those pertinent factors, leaving it adrift and unrestrained.

¶106 To date, this Court has not interpreted article 2, section 15 differently than the Eighth Amendment. The language of both provisions is virtually identical, both prohibiting infliction of "cruel and unusual punishment" (the Eighth Amendment uses the plural, "punishments"). We "do not follow federal precedent blindly" in interpreting our state's constitution, but up to this point we have found no "compelling reason to interpret Arizona's cruel and unusual punishment provision differently

from the related provision in the federal constitution." *State v. Davis*, 206 Ariz. 377, 380–81 ¶ 12 (2003). Accordingly, "[w]e ordinarily interpret the scope of a clause in the Arizona Constitution similarly to the United States Supreme Court's interpretation of an identical clause in the federal constitution," particularly when "this court has consistently followed federal precedent in [the] area." *State v. Noble*, 171 Ariz. 171, 173 (1992).

**¶107** Such consistency is found in this Court's article 2, section 15 jurisprudence regarding capital punishment. *See State v. Jackson*, 186 Ariz. 20, 25 (1996) (rejecting challenge to death penalty under article 2, section 15 and ascribing to it "the same meaning" as Eighth Amendment "where the parties do not argue otherwise"); *State v. Endreson*, 108 Ariz. 366, 370 (1972) (same, and stating: "Unless and until the United States Supreme Court orders us to do otherwise, or until the Arizona legislature sees fit to abolish the use of the death penalty in this State, we will continue to uphold its constitutionality and affirm its imposition when, because of aggravating circumstances, it is warranted."); *State v. Maloney*, 105 Ariz. 348, 358–60 (1970) (upholding capital punishment under article 2, section 15 while recognizing that societal status of that penalty was "in turmoil," with "a plethora of arguments pro and con on the question"); *State v. Boggs*, 103 Ariz. 328, 334–35 (1968) (holding that Arizona's death penalty does not violate article 2, section 15). The dissent's reliance on article 2, section 15 thus finds no support in our case law.

**¶108** Adopting the dissent's position would require overruling that longstanding Arizona precedent, apparently because it is deemed obsolete as being out of step with "the evolving standards of decency" in our "maturing society," *infra* ¶ 122 (quoting *Trop*, 356 U.S. at 101 (plurality opinion)), a notion this Court has not yet expressly embraced as a matter of state constitutional law. *Cf. Glossip*, 135 S. Ct. at 2749 (Scalia, J., concurring) (attempting "to divine 'the evolving standards of decency that mark the progress of a maturing society'" is "a task for which [judges] are eminently ill suited" (quoting *Trop*, 356 U.S. at 101 (plurality opinion))). But even if we assume that the Eighth Amendment standard applies for purposes of article 2, section 15, neither Bush nor the dissent urges us to overrule any prior Arizona case.

**¶109** Nor does the history of Arizona's provision seem to support the dissent. When our state's constitution, including article 2, section 15, was approved and adopted in 1912, Arizona law authorized capital punishment. *See generally* John D. Leshy, *The Arizona State Constitution*, at

79 n.24 (2d ed. 2013); C. McClennen, *Capital Punishment in Arizona*, Ariz. Attorney 17–21 (Oct. 1992). (Arizona voters abolished the death penalty in 1916 but then quickly repealed the prohibition in 1918.) At the constitutional convention, one delegate's proposal to ban capital punishment never reached the floor. Leshy, *supra*, at 79. And "another delegate successfully insisted on changing the conjunction between cruel and unusual from 'or' to 'and' to prevent the Arizona courts from outlawing new methods of execution, such as electrocution, on the grounds that they were simply unusual rather than cruel." *Id.* In addition, later amendments to the constitution explicitly refer to the death penalty, arguably "negating any inference that capital punishment is per se cruel and unusual in violation of [article 2, section 15]." *Id.*; *see also* Ariz. Const. art. 2, § 23 (1972) (trial by jury and number of jurors); Ariz. Const. art. 22, § 22 (1992) (methods of execution on judgments of death).

¶110 In sum, the dissent's resort to article 2, section 15 to support its view that Arizona's death penalty is unconstitutionally "cruel and unusual" is difficult to reconcile with the relevant text, history, and caselaw. *Cf. Glossip*, 135 S. Ct. at 2747 (Scalia, J., concurring) (noting that "not once in the history of the American Republic has this Court ever suggested the death penalty is categorically impermissible," largely because "[i]t is impossible to hold unconstitutional that which the Constitution explicitly *contemplates*" under the Fifth Amendment). And even if relevant facts might exist to support the dissent's critique in some respects, they certainly are not in this record as no such evidence was presented here. *Cf. Hidalgo*, 138 S. Ct. at 1057 (Breyer, J., respecting the denial of certiorari) (agreeing with the Court's denial of review when the undeveloped record lacked relevant evidence and was "limited and largely unexamined by experts and the courts below in the first instance").

¶111 Absent a constitutional violation, the propriety of Arizona's capital scheme is strictly a matter of policy, which is outside our purview under our constitution's separation of powers. *See* Ariz. Const. art. 3 ("[T]he legislative, the executive, and the judicial . . . departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others."). The dissent incorrectly suggests that we would defer to the legislature on matters of constitutional interpretation and application, abdicating our constitutional authority and responsibility. *Infra* ¶¶ 123–25. But that mischaracterizes our position and conflates constitutional issues, appropriate for judicial resolution, with

purely policy choices, appropriate for the law-making role of the legislature and governor, or the people themselves.

¶112      The dissent's various criticisms of the death penalty and its alleged flaws — the time and cost involved in pursuing and administering capital punishment; its arbitrary application and disproportionate or discriminatory impact on minorities; implicit and explicit biases, including racial and geographic disparities; and lack of any measurable deterrent effect — are arguments that have been raised over the years for total abolition of capital punishment. *See, e.g.*, *Maloney*, 105 Ariz. at 358–59. But these are largely policy-laden factors that are proper subjects for legislative consideration, debate, and decision, not appropriate topics for judicial resolution in the absence of any evidence or argument. *See, e.g.*, *Endreson*, 108 Ariz. at 370 (stating that "the question of the abolishment of the death penalty under the Arizona Constitution is a question properly left to the legislature or the people of this State through constitutional amendment"); *State v. Alford*, 98 Ariz. 124, 132 (1965) (declining to "pass upon whether capital punishment, as a public policy, is effective" because under Arizona's separation of powers, "[w]e are limited to the judicial function of faithfully and impartially interpreting the law as enacted by the legislature").

¶113      Finally, to the extent Bush raised any issues pertaining to the constitutionality of capital punishment in general, or of Arizona's statutory scheme in particular, he did so only in summary fashion so as to avoid preclusion in federal habeas corpus proceedings. We therefore decline the invitation to revisit various un-argued claims that, as Bush acknowledges, "have previously been rejected by this Court or the federal courts." For all these reasons, although we express no opinion prospectively if the issue is raised, developed, and argued, this is not the appropriate case to address or decide the validity of capital punishment under Arizona's Constitution.

## CONCLUSION

¶114      We affirm Bush's convictions and sentences.

CHIEF JUSTICE BALES, concurring in part.

**¶115**         I join ¶¶ 1–98 of the majority's opinion and ¶ 114 affirming Bush's convictions and sentences.  Bush did not develop any argument that Arizona's capital sentencing scheme generally violates the Eighth Amendment's prohibition on cruel and unusual punishment or its counterpart in article 2, section 15 of the Arizona Constitution.  Those issues are not before us, and I express no view on the prospective constitutional validity of Arizona's capital scheme based on properly raised arguments under the federal or state constitution.

JUDGE WINTHROP, concurring in part and dissenting in part.

¶116 Substantial evidence supports the jury's determinations regarding the defendant's role and criminal intent in carrying out these horrendous murders. I concur with the majority's analysis and resolution of the procedural and substantive issues raised in this appeal. I depart from my colleagues, however, on the issue of imposition of the death penalty. On that basis alone, and for reasons set forth below, I respectfully dissent.

¶117 The historical implementation of the death penalty bears little resemblance to its current administration. In distant times when the death penalty was quickly imposed, the execution was open for public viewing, and there was minimal evidence to contradict the accuracy of a defendant's conviction, the death penalty may have served as an efficient method of not only enforcing criminal law but also advancing legitimate policy goals. Society, however, has evolved and no longer administers the death penalty in this manner.

¶118 Instead of taking weeks, prisoners on death row, and the victim's families, often wait for decades for the sentence to be administered. Further, over the years, numerous studies have criticized the death penalty as disproportionally affecting defendants of color and, with increasing frequency, in part due to advancements in technology, we have become aware of defendants who have been wrongly convicted and whose death sentences have ultimately been commuted—either due to their own actual innocence or because of incurable procedural flaws from their trial. Some of these wrongful convictions were obtained because of overzealous prosecutors who pursued conviction and imposition of the death penalty at the expense of candor; some convictions were obtained because of the failures of defendants' resource-deprived appointed counsel; some convictions were obtained because of jurors' biases; and some may have been fortuitously imposed simply because of the county in which the defendant committed the crime. Each conviction obtained through these means highlights the flaws in administering the death penalty, and our historic inability to devise a method to implement the death penalty free from human bias and error.

¶119 Additionally, the death penalty has not been conclusively shown to deter criminal behavior, a primary rationale of criminal law and sentencing. Moreover, taxpayers are spending millions of dollars to prosecute, convict, and sentence defendants to death. As further explained

below, the death penalty has been shown to be cruel and unusual, to not have any notable deterrent effect, to impose unintended trauma on the victim's family and friends, and to be cost prohibitive.

¶120    Although current United States Supreme Court jurisprudence rejecting Eighth Amendment attacks on the death penalty preclude a state court from interpreting the United States Constitution to provide greater protection than the Court's own federal constitutional precedents provide, *Arkansas v. Sullivan*, 532 U.S. 769, 772 (2001), state courts "are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution." *Arizona v. Evans*, 514 U.S. 1, 8 (1995). Because we may interpret Arizona's Constitution to provide greater protections to Arizona citizens, I would hold, as a matter of state law, that the death penalty is unconstitutional.[1]

### A.    Cruel and Unusual Punishment

¶121    Throughout history, the Fifth Amendment has provided a constitutional basis for the death penalty. U.S. Const. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."). The Fifth Amendment, however, does not grant unbridled discretion in sentencing defendants convicted of capital crimes to death; rather, the Fifth Amendment is limited by the Eighth Amendment's prohibition against cruel and unusual punishment. *See* U.S. Const. amend. VIII; *see also Trop v. Dulles*, 356 U.S. 86, 100 (1958) (stating that "[w]hile the State has the power

---

[1] In addition to the grounds discussed herein, I also note that Arizona's death penalty, as currently administered, may be flawed for additional reasons. For a state's capital sentencing scheme to be constitutional, it must serve a narrowing function and "limit the class of murderers to which the death penalty may be applied." *Brown v. Sanders*, 546 U.S. 212, 216 (2006). Instead of ensuring that only those who commit the most heinous crimes are eligible for the death penalty, however, Arizona's list of aggravating factors, A.R.S. § 13-751(F), expands the class of death-eligible defendants to nearly all first-degree murder defendants. *See Hidalgo v. Arizona*, 138 S. Ct. 1054, 1057 (2018) (Breyer, J., respecting the denial of certiorari) (stating that the unrebutted evidence that approximately "98% of first-degree murder defendants in Arizona were eligible for the death penalty . . . points to a possible constitutional problem").

to punish, the [Eighth] Amendment stands to assure that this power be exercised within the limits of civilized standards"). Similarly, Arizona's statutory capital sentencing scheme is limited by article 2, § 15 of the Arizona Constitution ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted.").

¶122 Neither the federal nor state constitution defines what constitutes "cruel and unusual" punishment. Instead, we determine what constitutes cruel and unusual punishment based on "the evolving standards of decency that mark the progress of a maturing society." *Trop*, 356 U.S. at 101; *accord Furman v. Georgia*, 408 U.S. 238, 242 (1972) (Douglas, J., concurring); *see also Weems v. United States*, 217 U.S. 349, 378 (1910) (explaining that what is "cruel and unusual" "is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice") (citing *Ex parte Wilson*, 114 U.S. 417, 427 (1885) and *Mackin v. United States*, 117 U.S. 348, 350 (1886)).

¶123 The majority opinion argues that determining "evolving standards of decency that mark the progress of a maturing society" is a role reserved for the legislature and, as a matter of respecting constitutionally-mandated separation of powers, courts should decline to usurp that role. *Supra* ¶¶ 108, 111–12. Although the lawmaking role belongs to our legislature, legislative measures are not the sole determinant of the bounds of the Eighth Amendment; indeed, the Eighth Amendment is intended to safeguard against the abuse of legislative power. *See Gregg v. Georgia*, 428 U.S. 153, 174 (1976). Because article 2, § 15 imposes a similar restraint on the exercise of the legislative power as it relates to imposition of the death penalty, our courts must bring their own independent judgments to bear on this question. *See Atkins v. Virginia*, 536 U.S. 304, 312 (2002).

¶124 Further, it is expressly the role of the court to consider "objective indicia of society's standards, as expressed in legislative enactments and state practice" to determine whether national consensus repudiates the sentencing practice at issue. *Roper v. Simmons*, 543 U.S. 551, 563 (2005). And, guided by "the standards elaborated by controlling precedents and *by the [c]ourt's own understanding and interpretation* of the Eighth Amendment's text, history, meaning, and purpose," the court must determine whether the punishment in question violates the Constitution. *Kennedy v. Louisiana*, 554 U.S. 407, 421 (2008) (emphasis added).

¶125 Although article 3 of the Arizona Constitution appears to prohibit any comingling of the legislative, executive, and judicial powers, Arizona courts have acknowledged a sharing or blending of those powers, particularly where the issue is prevention and punishment of criminal activity. *State v. Ramsey*, 171 Ariz. 409, 413 (App. 1992). This Court has acknowledged that blended powers are not *per se* invalid. *State ex rel. Woods v. Block*, 189 Ariz. 269, 275–76 (1997). While still respecting Arizona's firmly-established principle of separation of powers, this Court adopted the test established by the Arizona Court of Appeals that determines whether "one branch of government is exercising the powers belonging to either of the others." *Id.* (adopting the multi-part test established in *J.W. Hancock Enters., Inc. v. Ariz. State Registrar of Contractors*, 142 Ariz. 400, 405 (App. 1984)) (internal citation omitted). Where, as here, we review defendant's convictions and the imposition of the sentence of death—the ultimate punishment intended, in theory, to deter criminal activity—the exercise of such blended authority is indeed appropriate. *See Ramsey*, 171 Ariz. at 413.

¶126 We no longer question whether the Eighth Amendment prohibits certain punishments like "public dissection, burning alive, . . . crucifixion, [and] breaking on the wheel" as cruel and unusual, because our courts have routinely found these punishments, or their equivalents, to be unconstitutional. *Glossip v. Gross*, 135 S. Ct. 2726, 2792 (2015) (Sotomayor, J., dissenting) (internal quotation marks omitted) (quoting *Wilkerson v. Utah*, 99 U.S. 130, 135–36 (1879) and *In re Kemmler*, 136 U.S. 436, 446 (1890)). Moreover, over the years we have categorically barred certain punishments as cruel and unusual, such as punishments which involve torture or the denaturalization of a citizen, in certain circumstances. *See Trop*, 356 U.S. at 101. More recently, the Supreme Court has expanded which punishments the Constitution categorically prohibits to include imposing a death sentence on a minor, *Roper*, 543 U.S. at 568, or on a defendant that suffers from a mental disability. *Atkins*, 536 U.S. at 321.

¶127 Society's standard of what constitutes cruel and unusual punishment has continued to evolve to the point where many states have either abolished the death penalty in its entirety or, by inaction over a period of years, have signaled concerns about the constitutionality of such

a punishment.[2] This trend to abolish the death penalty or not carry out a death sentence stands in stark contrast to the intransigence of other jurisdictions' continued implementation of the death penalty. As society continues to evolve to reject the death penalty, so too should we.

### 1. **Unconstitutionally Cruel**

**¶128** Simply stated, the death penalty cannot be implemented in a way that is not cruel. Most modern executions are conducted by lethal injection, which is assumed to be a more humane method of death than prior methods. *See* Death Penalty Info. Ctr., *supra* ¶ 127 n.2. This assumption, however, has not proven to be true. Numerous defendants executed by lethal injection do not die instantly and instead have appeared to be "drowning in air." Michael Kiefer, *Reporter Describes Arizona Execution: 2 Hours, 640 Gasps*, Arizona Republic, Nov. 6, 2014, https://www.azcentral.com/story/news/arizona/politics/2014/07/24/arizona-execution-joseph-wood-eyewitness/13083637. Executions, which are only supposed to last approximately ten minutes, have lasted for hours before the defendant was pronounced dead. *Id.* Other execution attempts have required the state to halt the process and later make another attempt (often, multiple attempts) to execute a defendant. *See, e.g.*, *State v. Broom*, 51 N.E.3d 620, 623 (Ohio 2016) (concluding that a state does not violate the Constitution by attempting to execute a defendant after a failed execution), *cert. denied*, 137 S. Ct. 590 (2016).

**¶129** Not only does the defendant suffer the pain of dying by lethal injection, which Justice Sotomayor has likened to be the "chemical equivalent of being burned alive" *Glossip*, 135 S. Ct. at 2795 (Sotomayor, J., dissenting), but the defendant also suffers the mental and emotional turmoil of uncertainty associated with the post-conviction process, the delays associated with last-minute appeals and, ultimately, the uncertainty as to the efficacy of the procedure itself. This "humane" method of death is

---

[2] Nineteen states have abolished the death penalty and eleven states have not had an execution in more than eight years. *See Glossip*, 135 S. Ct. at 2773 (Breyer, J., dissenting) (citing Death Penalty Info. Ctr., *States With & Without the Death Penalty* (Nov. 9, 2016), http://www.deathpenaltyinfo.org/states-and-without-death-penalty).

failing.  The result is that death row inmates are subject to physical and emotional torture.[3]

### 2. Unconstitutionally Unusual

**¶130**        The death penalty not only inflicts unnaturally cruel punishment, but the application and implementation of the death penalty is, at best, arbitrary and capricious, and therefore constitutionally "unusual," and violative of article 2, § 15.  The Supreme Court has found that punishments that discriminate against a defendant based on "race, religion, wealth, social position, or class" are unconstitutional.  *Furman*, 408 U.S. at 242 (Douglas, J., concurring); *see also Gregg*, 428 U.S. at 188 (concluding that punishment which is "inflicted in an arbitrary and capricious manner" is unconstitutional).  Although the original intent may have been to administer the death penalty consistently upon the worst criminals, if anything, with time we have realized that we cannot devise a way to implement the death penalty free from explicit or implicit bias.

**¶131**        In *Furman*, the Supreme Court struck down the death penalty, as then implemented, as unconstitutional.  408 U.S. at 239–40.  The Court found that the states were disproportionately sentencing defendants of color to death.  *Id.* at 254–55 (Douglas, J., concurring).  Following *Furman*, many states attempted to devise a more precise sentencing scheme with the goal of curtailing the arbitrary implementation of the death penalty.  Four years after *Furman*, the Supreme Court upheld Georgia's sentencing schemes in *Gregg*, essentially reaffirming the constitutionality of the death

---

[3]   Often lost in the media reporting of the delays and of the botched execution attempts is the continued, inhumane trauma imposed on the victim's families and friends.  *See* Jason Marsh, *Does death penalty bring closure?*, CNN, May 20, 2015, https://www.cnn.com/2015/05/20/opinions/marsh-tsarnaev-forgiveness/index.html (finding the victim's families and friends rarely feel closure once a defendant is sentenced to death, in part, because the post-conviction process may take years during which time the facts of the case continue to be replayed); *see also* Samuel R. Gross & Daniel J. Matheson, *What They Say   at the End: Capital Victims' Families and the Press*, 88 Cornell L. Rev. 486, 490 (2003) (explaining that most of the victim's families and friends just want the process "to be over," which may not occur until decades after the sentence–after the defendant has exhausted his appeals process).

penalty throughout the nation. Unfortunately, the concerns raised in *Furman* persist despite new sentencing schemes.

**¶132** Although instances of overt discrimination have perhaps abated, jurors today are still affected by racial bias. *See* David R. Dow, *Death Penalty, Still Racist and Arbitrary*, N.Y. Times, July 8, 2011, https://www.nytimes.com/2011/07/09/opinion/09dow.html. In the years following *Furman* and *Gregg*, one study gained renown for highlighting racial discrepancies in criminal sentencing. David C. Baldus, Charles Pulaski & George Woodworth, *Comparative Review of Death Sentences: An Empirical Study of the Georgia Experience*, 74 J. Crim. L. & Criminology 661 (1983) (the "Baldus study"). The Baldus study evaluated over 2000 homicides in Georgia and found that "black defendants were 1.7 times more likely to receive the death penalty than white defendants and that murderers of white victims were 4.3 times more likely to be sentenced to death than those who killed blacks." Dow, *supra*; *accord* John D. Bessler, *Tinkering Around the Edges: The Supreme Court's Death Penalty Jurisprudence*, 49 Am. Crim. L. Rev. 1913, 1929 (2012). The Baldus study has been tested numerous times since it was initially conducted and has been replicated in other jurisdictions, and yet, "all [studies] reflect the same basic racial bias." Dow, *supra*.

**¶133** As recently as 2015, Justice Breyer noted that "[n]umerous studies . . . have concluded that individuals accused of murdering white victims, as opposed to black or other minority victims, are more likely to receive the death penalty." *Glossip*, 135 S. Ct. at 2760–61 (Breyer, J., dissenting); *see also* Robert Barnes, *Supreme Court Says Race-Based Testimony Discriminated Against Black Death Row Inmate*, Wash. Post, Feb. 22, 2017, https://www.washingtonpost.com/politics/courts_law/supreme-court-says-race-based-testimony-discriminated-against-death-row-black-inmate/2017/02/22/c7a1590a-f915-11e6-9845-576c69081518_story.html (reporting that the United States Supreme Court would reopen the defendant's sentencing after finding it was infected with racial prejudice); Shelly Song, *Race Consciousness in Imposing the Death Penalty*, 17 Rich. J.L. & Pub. Int. 739, 743 (2014) (finding that African Americans make up roughly 42% of the population on death row, and yet, make up only 12.6% of the United States' population). The potential for racial bias in imposition of the death penalty is prevalent throughout the country, and Arizona is no exception. *See* Fair Punishment Project, *Too Broken to Fix: Part I, an In-depth Look at America's Outlier Death Penalty Counties*, Fair Punishment Project 1,

11–12, Aug. 2016, http://fairpunishment.org/wp-content/uploads/2016/ 08/FPP-TooBroken.pdf (finding that, although African Americans make up only 6% of the population in Maricopa County, they account for about 18% of death penalty defendants).

**¶134** Studies also suggest that, in addition to the arbitrariness of a defendant's perceived race, a defendant's geographic location may also be indicative of whether the death penalty will be imposed. *See Glossip*, 135 S. Ct. at 2761 (Breyer, J., dissenting) (stating that "the imposition of the death penalty heavily depends on the county in which a defendant is tried"). One study examining the imposition of the death penalty from 2004 to 2009 found that "just 29 counties (fewer than 1% of counties in the country) accounted for approximately half of all death sentences imposed nationwide." *Id.* (citing Robert J. Smith, *The Geography of the Death Penalty and Its Ramifications*, 92 B.U. L. Rev. 227, 231–32 (2012)). This is largely because "[m]ost death penalty cases are prosecuted at the county level, and there are great disparities between the counties." *See* Adam M. Gershowitz, *Pay Now, Execute Later: Why Counties Should Be Required to Post a Bond to Seek the Death Penalty*, 41 U. Rich. L. Rev. 861, 862 (2007).[4]

---

[4] Along with other select jurisdictions, Arizona is notorious for having some of the most aggressive death penalty prosecutors in the country who, at times, have violated ethical rules to obtain a conviction. *See* Fair Punishment Project, *America's Top Five Deadliest Prosecutors: How Overzealous Personalities Drive the Death Penalty*, Fair Punishment Project 1, 20, 24, June 2016, http://fairpunishment.org/wp-content/uploads/2016/ 06/FPP-Top5Report_FINAL.pdf (naming Kenneth Peasley, from Pima County, known as a "death-penalty machine," as a "runner up" and Jeannette Gallagher, from Maricopa County, a "prosecutor to watch"); *see also State v. Hulsey*, 243 Ariz. 367, 429–30 ¶ 89 (2018) (concluding that another Maricopa County death-penalty prosecutor, Juan Martinez, "engaged in several instances of misconduct" during the case); *In re Peasley*, 208 Ariz. 27, 29 ¶¶ 1, 66 (2004) (concluding disbarment for "present[ing] false testimony in the prosecution of two capital murder defendants" was required); Michael Kiefer, Rebecca McKinsey & Aubree Abril, *Direct Appeals of Death-Penalty Cases Since 2002*, Arizona Republic, http://archive.azcentral.com/news/projects/prosecutorial-conduct (compiling a list of death penalty cases that underwent direct review by the

**¶135**　　　　　Evidence of arbitrary application of the death penalty by county exists in Arizona as well.  While on a national level, relatively few counties sentence defendants to death, Maricopa County is among one of the most active counties to do so.  A study published in August 2016, found that only sixteen (including Maricopa County) out of 3143 counties or county equivalents sentenced five or more individuals to death between 2010 and 2015.  *See* Fair Punishment Project, *supra* ¶ 133, at 2.  Maricopa County's rate of sentencing a defendant to death for a homicide "is approximately 2.3 times higher than the rate for the rest of Arizona."  *Id.*, at 8 (citing Frank Baumgartner, *Rate of Death Sentencing 2006-2015*, Aug. 15, 2016, http://fairpunishment.org/wp-content/uploads/2016/08/RateofDeathSentencing2006-2015.pdf).[5]  Although this case arises from Pima County, and we have rejected the defendant's claims that the prosecutor in this matter engaged in any improper conduct, the vast sentencing differences among the counties demonstrates how arbitrary the implementation of the death penalty is.  To be sentenced to death may not entirely depend on the egregiousness of the crime, but rather may be impermissibly influenced by the county where a defendant is tried and/or the prosecutorial charging practice in that county for capital-eligible offenses.

---

Arizona Supreme Court from 2002–2009, and reporting that Peasley, Gallagher, and Martinez were found to have engaged in improper conduct during some of their cases) (last visited July 25, 2018).

[5] One possible explanation for a higher incidence of death sentencing in Maricopa County might be that it by far has the largest population of any Arizona county; however, Maricopa County's population is one percent of the nation's population, yet the data shows that it accounts for 3.6 percent of the death sentences returned nationally between 2010 and 2015.  *See* Fair Punishment Project, *supra* ¶ 133, at 8.  The same Harvard-based report also argues that the charging of a capital offense—and, ultimately imposition of the death penalty—may be as heavily influenced by the attitudes of the County Attorney for the particular state county.  *Id.* at 8–9 (noting the capital case charging history of Andrew Thomas as Maricopa County Attorney in pursuing capital charges at "nearly twice the rate of his predecessor"); *see also* Jennifer Steinhauer, *Policy Shift on Death Penalty Overwhelms Arizona Court*, N.Y. Times, Mar. 5, 2007, http://www.nytimes.com/2007/03/05/us/05death.html.

¶**136**        Time has shown that the death penalty is imposed in an arbitrary fashion and, other than abolition, states have not found a remedy to cure these deficiencies.  We simply can no longer ignore the seemingly inherent variants and problems associated with implementing the death penalty.  *See, e.g.*, *Callins v. Collins*, 510 U.S. 1141, 1145 (1994) (Blackmun, J., dissenting) ("From this day forward, I no longer shall tinker with the machinery of death.").  To continue to affirm the enforcement the death penalty, given what we now know, is to approve a punishment that is both cruel and unusual.

## B.  Deterrent Effect

¶**137**        One of the main historic rationales offered in support of the death penalty is that it deters future crime.  *See Gregg*, 428 U.S. at 183 ("The death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders.").  Deterrence purportedly works by "discourag[ing] or restrain[ing] [an] individual from acting or proceeding through the inducement of fear, doubt, or some sense of deprivation."  Frank G. Carrington, *Deterrence, Death, and the Victims of Crime: A Common Sense Approach*, 35 Vand. L. Rev. 587, 588 (1982).  The theory of deterrence assumes that humans are motivated to increase gains and minimize losses and will act accordingly.  *Id.*  Thus, a rational actor will not commit a crime if the consequence (or the cost) of committing that crime becomes too high.  *Id.*  In the criminal context, deterrence does not necessarily discourage a defendant from committing similar, future crimes, but "sends a message" and discourages the general public from committing crimes based on the punishment a defendant receives.  *Id.*

¶**138**        A flaw of the deterrence theory, however, is that it assumes all individuals, including criminals, act rationally and will undertake a cost/benefit analysis before acting.  *See* Rudolph J. Gerber, *Economic and Historical Implications for Capital Punishment Deterrence*, 18 Notre Dame J.L. Ethics & Pub. Pol'y 437, 440 (2004).  This assumption has proven unreliable.  Murders are often committed in situations where the defendant lacked the capacity to act rationally, such as murders committed when the defendant is under the influence of alcohol, is in a sudden fit or rage, or is mentally incompetent (e.g., murder/suicides).  *See* Jeffrey Fagan, *Death and Deterrence Redux: Science, Law and Causal Reasoning on Capital Punishment*, 4 Ohio St. J. Crim. L. 255, 276–77 (2006).  Regardless of the irrationality of the underlying criminal act, the death penalty has been justified precisely for its assumed ability to deter future similar behavior.  *See* Joanna M.

Shepherd, *Deterrence Versus Brutalization: Capital Punishment's Differing Impacts Among States*, 104 Mich. L. Rev. 203, 204–05 (2005) (compiling instances of government and public support for capital punishment because of its deterrent effect).

**¶139**       In *Gregg*, the Court found that the death penalty's deterrent effect was inconclusive and essentially tasked the state legislatures to determine whether the death penalty had a deterrent effect. *See Gregg*, 428 U.S. at 184–86 ("The value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with the legislatures, which can evaluate the results of statistical studies in terms of their own local conditions."). *Gregg* was decided in 1976; however, in the subsequent years, there has been no consensus reached regarding this issue.

**¶140**       One of the most frequently cited, and criticized, studies on the deterrent effect of the death penalty is Isaac Ehrlich's study from the 1970s, *The Deterrent Effect of Capital Punishment: A Question of Life and Death*, 65 Am. Econ. R. 3 (1975); *see also* Allan D. Johnson, *The Illusory Death Penalty: Why America's Death Penalty Process Fails to Support the Economic Theories of Criminal Sanctions and Deterrence*, 52 Hastings L.J. 1101, 1117 (2001). Ehrlich's study found that there was a positive correlation between the death penalty and a decrease in homicides. *See* Ehrlich, at 397; Johnson, at 1118. Ehrlich's study, however, has never been replicated. Johnson, at 1117–18. Indeed, "[m]ost modern empirical studies using Ehrlich's . . . analysis have found that the death penalty has virtually the same effect on murder rates as long-term imprisonment." *Id.* at 1118.

**¶141**       Subsequent studies of this issue, however, largely agree that the death penalty has no measurable deterrent effect. *See* Thomas E. Robins, *Retribution, the Evolving Standard of Decency, and Methods of Execution: The Inevitable Collision in Eighth Amendment Jurisprudence*, 119 Penn. St. L. Rev. 885, 897 (2015) (finding "[a] recent study conducted by the National Academy of Sciences found no evidence that capital punishment affected homicide rates"); *see also* Michael L. Radelet & Traci L. Lacock, *Do Executions Lower Homicide Rates?: The Views of Leading Criminologists*, 99 J. Crim. L. & Criminology 489, 489–90 (2009) ("The findings demonstrate an overwhelming consensus among these criminologists that the empirical research conducted on the deterrence question strongly supports the conclusion that the death penalty does not add deterrent effects to those already achieved by long imprisonment."). Even if we assumed that the death penalty could deter future crimes, its deterrent effect flows at least in

part from its historic implementation, which allowed for the public's observation of the execution. *See* Gerber, *supra* ¶ 138, at 449 ("Our nation's history of capital punishment demonstrates a steady departure from the four requirements [(1) swiftness; (2) certainty; (3) proportionality; and (4) publicity] needed both for deterrence and for rational calculation of disincentives.").

¶142        If capital punishment fails to serve a deterrent effect, which we now know is likely true, there is little benefit to be gained from sentencing a defendant to death. Surely any penological goal of retribution is lost by the time the defendant is finally executed (sometimes decades after the commission of the crime).

¶143        I by no means intend to diminish the pain experienced by the families and friends of the deceased victims by suggesting that the death penalty no longer fulfills the goals of, and its historical role in, criminal punishment. Instead, I question the continued use of the death penalty if it no longer serves society's legitimate goals of deterring crime and bringing just results to crime victims.

## C.   Financial Costs

¶144        Supporters of the death penalty view it as serving many functions, both as a punishment for the defendant as well as a benefit to society. It must be noted, however, that the cost of the death penalty, especially considering its apparent minimal, if not nonexistent, deterrent value, far outweighs any lasting benefit society might derive from its continued implementation.

¶145        Some continue to hold the mistaken belief that the death penalty is a cost-effective way to enforce criminal sentences. *See* Kelly Phillips Erb, *Considering the Death Penalty: Your Tax Dollars at Work*, Forbes (May 1, 2014, 12:12 AM), https://www.forbes.com/sites/kellyphillipserb/ 2014/05/01/considering-the-death-penalty-your-tax-dollars-at-work/ #27e972b6664b. The actual costs of administering capital punishment, however, are staggering. One estimate found that states spend as much as two times the amount per year to simply house death-penalty inmates. *Id.* Another report found that California alone spends approximately $137 million a year on death-row inmates compared to $11.5 million on inmates serving life sentences. *See* Amnesty Int'l, *Death Penalty Cost*, Amnesty Int'l, https://www.amnestyusa.org/issues/death-penalty/

death-penalty-facts/death-penalty-cost/ (last visited July 26, 2018) (citing California Commission for the Fair Administration of Justice, July 2008).[6]

**¶146** Most of these costs are litigation-related. *See* Nicholas Petersen & Mona Lynch, *Prosecutorial Discretion, Hidden Costs, and the Death Penalty: The Case of Los Angeles County*, 102 J. Crim. L. & Criminology 1233, 1240–41 (2012). Death-penalty cases are extremely expensive to litigate, in part, because death-penalty cases require at least two death-qualified litigators—one who focuses on the guilt phase, and one who focuses on gathering evidence to present in mitigation.[7] *See* Am. Bar Ass'n, *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 999 (2003). Moreover, counties that do not have death-qualified litigators must contract at great expense with outside counsel to represent defendants. *See, e.g.*, David Louis, *The Cost of Death: Legal Fees in Mohave County Death Penalty Cases Cost More than $1 Million for Each Trial*, DailyMiner, Feb. 25, 2018, https://kdminer.com/news/2018/feb/25/cost-death-legal-fees-mohave-county-death-penalty-/.

**¶147** Many death-penalty cases in Arizona cost the state millions of dollars just for the first trial.[8] *See* Kent Cattani & Paul J. McMurdie, *Jody*

---

[6] Although the exact amount of money a state spends on death-penalty cases varies, the cost of trying death-penalty cases is overwhelmingly more than non-death-penalty cases. *See* Amnesty Int'l, *supra* ¶ 145 (reporting that Kansas spends seventy percent more, Tennessee spends around forty-eight percent more, and Maryland spends approximately three times as much money on death-penalty cases than non-death-penalty cases) (citations omitted).

[7] The requirements to become a death-qualified litigator understandably limit the number of attorneys available to defend capital cases. The result is that qualified counsel, from both the private and public bar, are overworked and may not always be in the best position to provide defendants with comprehensive representation.

[8] These costs may include both the prosecution's and the defense's "cost of preparing for capital trials—including mitigation investigation, retaining experts for both guilt-innocence and punishment phase issues, [and]

*Arias and the Cost of Seeking the Death Penalty*, The Nat'l Judicial Coll., Aug. 20, 2015, http://www.judges.org/jody-arias-and-the-cost-of-seeking-the-death-penalty/ (reporting that the Arias trial cost the State around $3 million). The cost for the initial trial does not include the post-conviction process, including appeals and *habeas* proceedings, which further increase the costs to the taxpayers. *Id.* (finding "[t]he death penalty process in Arizona includes . . . proceedings that generally span a period of more than 20 years, and such proceedings . . . add[] hundreds of thousands of dollars in costs for the prosecution and defense, not to mention judicial costs"); *see also* Michael Kiefer, *Is the Death Penalty in Arizona on Life Support?*, Arizona Republic, Apr. 23, 2016, https://www.azcentral.com/story/news/local/arizona-investigations/2016/04/23/death-penalty-lethal-injection-arizona-midazolam/83242098/ ("A capital case that goes to trial and results in a not-guilty verdict costs the county an average of $580,255 for defense. A capital trial that ends in a death sentence costs an average of $1,066,187 to defend.").[9]

**¶148** One solution often offered when the issue of cost is raised is to shorten the appeals process or reduce the number of attorneys representing a defendant. That solution, however, creates even further constitutional problems because it would severely inhibit a defendant's right to due process and fundamentally fair procedures. Any change in how death-penalty cases are staffed, tried, or handled in the post-conviction phase to make the process more affordable will likely create a system that affords defendants even less procedural protections and leaves them open to a greater chance that a wrongful conviction will be obtained. Moreover, given the continued reports that demonstrate defendants may be sentenced to death because of jurors' inherent bias, and studies that demonstrate the

---

extensive motions practice." Carol S. Steiker & Jordan M. Steiker, *Cost and Capital Punishment: A New Consideration Transforms an Old Debate*, 2010 U. Chi. Legal F. 117, 141 (2010).

[9] One somewhat dated Arizona study, conducted in 2001, found that "it cost an average of $163,897.26 for death sentence cases and $70,231.34 for non-capital cases (resulting in life sentences)." Robert L. Gottsfield & Marianne Alcorn, *The Capital Case Crisis in Maricopa County, What* (*Little*) *We Can Do About It*, 45 Ariz. Att'y 22, 26 (May 2009). The authors of this study, however, examined only thirty cases, and found that "when all true costs are discovered and assessed, the figure will be considerably higher." *Id.*

death penalty has no identifiable deterrent effect, the answer to the question of whether the cost of the death penalty outweighs the societal benefit is a resounding, "No."

## CONCLUSION

¶149       For these reasons, I respectfully dissent as it relates to the imposition of the death penalty. This Court should conclude that the death penalty violates article 2, § 15 of the Arizona Constitution.